# IN THE SUPREME COURT OF TEXAS

══════════

No. 12-0518

══════════

IN RE NESTLE USA, INC., RELATOR

═══════════════════════════════════════════════════════

ON PETITION FOR WRIT OF MANDAMUS

═══════════════════════════════════════════════════════

**Argued September 18, 2012**

JUSTICE HECHT delivered the opinion of the Court, joined by CHIEF JUSTICE JEFFERSON, JUSTICE MEDINA, JUSTICE GREEN, JUSTICE JOHNSON, and JUSTICE GUZMAN.

JUSTICE WILLETT delivered a dissenting opinion, joined by JUSTICE LEHRMANN.

Since first imposing a franchise tax in 1893, the Legislature has restructured it several times, drawing various distinctions among taxpayers with adjustments, deductions, and exemptions that have become elaborate. Petitioner in this original proceeding contends that the franchise tax now in place bears no reasonable relationship to its object, the value of the privilege of doing business in Texas, and therefore violates the Texas Constitution's mandate that "[t]axation shall be equal and

uniform",[1] the Fourteenth Amendment's Equal Protection and Due Process guarantees,[2] and the U.S. Constitution's Commerce Clause.[3] We conclude that petitioner's challenges are without merit.

# I

## A

Texas' first franchise tax, enacted in 1893, was $10 annually for "each and every private domestic corporation heretofore chartered or that may be hereafter chartered under the laws of this State, and each and every foreign corporation that has received or may hereafter receive a permit to do business under the laws of this State, in this State . . . ."[4] In 1897, the Legislature adopted a graduated rate that increased in steps with the amount of a corporation's capital stock.[5] The rate was significantly higher for foreign corporations.[6] In 1905, the Legislature changed to a graduated rate

---

[1] TEX. CONST. art. VIII, § 1(a).

[2] U.S. CONST. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

[3] U.S. CONST. art. I, § 8 ("The Congress shall have power . . . [t]o regulate Commerce . . . among the several States . . . .").

[4] Act approved May 11, 1893, 23d Leg., R.S., ch. 102, § 5, 1893 Tex. Gen. Laws 156, 158, *reprinted in 10 H.P.N. Gammel*, *The Laws of Texas 1822–1897*, at 586, 588 (Austin, Gammel Book Co. 1898), codified as TEX. REV. CIV. STAT. art. 5243i. The same statute imposed a gross premium receipts tax of 0.5%-1.25% on insurance companies, a $0.25/telephone tax on telephone companies, and a 0.25% tax on the capital stock or similar interests of certain railway car companies or unincorporated businesses. *Id.* §§ 1-4.

[5] Act approved April 30, 1897, 25th Leg., R.S., ch. 104, § 1, 1897 Tex. Gen. Laws 140, 141 *reprinted in 10 H.P.N. Gammel*, *The Laws of Texas 1822-1897*, at 1194-1195 (Austin, Gammel Book Co. 1898), amending TEX. REV. CIV. STAT. art. 5243i. For a domestic corporation with capital stock of: $50,000 or less, $10; over $50,000 but less than $100,000, $20; $100,000 or more but less than $200,000, $30; and $200,000 or more, $50. *Id.*

[6] *Id.* For a foreign corporation with capital stock: $25,000 or less, $25;$25,000 or more up to and including $100,000, $100; more than $100,000, $1 per $10,000. *Id*. The court in *Woessner v. H.T. Cottam & Co.*, 47 S.W. 678, 680 (Tex. Civ. App. 1898, writ denied), held that "[t]he statute, in so far as it attempts to lay a tax on interstate commerce, is unconstitutional and void."

that decreased in steps with the amount of a corporation's capital stock.[7] As before, the rate for foreign corporations was similar but higher.[8] Extensive amendments in 1907 kept the graduated rate for foreign corporations but adopted a mostly flat rate for domestic corporations, one based not only on authorized capital stock but in some instances on surplus and undivided profits as well.[9] And for the first time, the Legislature created exemptions — for

> corporations organized for the purpose of religious worship; or for providing places of burial not for private profit; or corporations organized for the purpose of holding agricultural fairs and encouraging agricultural pursuits, or for strictly educational purposes, or for purely public charity.[10]

The structure of the franchise tax continued to evolve. The distinction in rates between domestic and foreign corporations was abandoned in 1930.[11] In 1981, statutory provisions governing the franchise tax were codified in Chapter 171 of the Texas Tax Code.[12] The tax remained based on

---

[7] Act approved March 1, 1905, 29th Leg., R.S., ch. 19, § 1, 1905 Tex. Gen. Laws 21, 22, *reprinted in 12 H.P.N. Gammel*, *The Laws of Texas*, at 887-889 (Austin, Gammel Book Co. 1905), amending TEX. REV. CIV. STAT. art. 5243i. For domestic corporations, the rate was $1 for each $2,000 of capital stock up to and including $100,000; plus $1 for each $10,000 of capital stock over $100,000, up to and including $1 million; plus $1 for each $20,000 of capital stock over $1 million, up to and including $10 million; plus $1 for each $50,000 of capital stock over $10 million. *Id.*

[8] *Id.* For foreign corporations, the rate was $1 for each $1,000 of capital stock up to $100,000; plus $1 for each $5,000 of capital stock over $100,000, up to and including $1 million; plus $1 for each $20,000 of capital stock over $1 million, up to and including $10 million; plus $1 for each $50,000 of capital stock over $10 million. *Id.*

[9] Act approved May 16, 1907, 30th Leg., R.S., ch. 23, §§ 1-2, 1907 Tex. Gen. Laws 502, 502-503, *reprinted in 13 H.P.N. Gammel*, *The Laws of Texas*, at 502, 502-503 (1907). The annual tax for domestic corporations was $0.50 for each $1,000 of authorized capital stock up to and including $1 million, or for each $1,000 of issued stock plus surplus and undivided profits, if more than the authorized capital stock. For authorized capital over $1 million the rate lowered to $0.25 per $1,000. The 1897 structure, with different rates, applied to foreign corporations. *Cf. supra* note 6.

[10] *Id.* § 13, 1907 Tex. Gen. Laws at 507.

[11] Act of March 20, 1930, 41st Leg., 5th C.S., ch. 68, § 1, 1930 Tex. Gen. Laws 220, 220, amending TEX. REV. CIV. STAT. art. 7084.

[12] *See* Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1691-1710, codifying TEX. TAX CODE §§ 171.001-.401.

a corporation's stated capital and surplus,[13] but the rate was a flat .425%, with some exceptions.[14] Over the years, many exemptions were added to those created in 1907 — for railway terminal corporations with no annual net income;[15] savings and loan associations,[16] credit unions,[17] and banks;[18] open-end investment companies;[19] marketing associations[20]; lodges[21]; development corporations;[22] various kinds of cooperative corporations;[23] various nonprofits;[24] corporations with

---

[13] *Id.* § 171.101.

[14] *Id.* § 171.002. The minimum tax was $55. *Id.* A lower rate was available to certain corporations that did not use public highways by authority of a certificate of convenience and necessity issued by the Railroad Commission, *id.* § 171.003, and a corporation with less than $1 million in assets could elect to be taxed on its assets, *id.* § 171.004.

[15] *Id.* § 171.053.

[16] *Id.* § 171.054.

[17] *Id.* § 171.077.

[18] *Id.* § 171.078.

[19] *Id.* § 171.055.

[20] *Id.* § 171.069.

[21] *Id.* § 171.070.

[22] *Id.* § 171.074.

[23] *Id.* §§ 171.071 (farmers), 171.073 (laundry), 171.075 (co-ops generally), 171.076 (credit), 171.079 (electric co-ops), & 171.080 (telephone co-ops).

[24] *Id.* §§ 171.063 (federally tax-exempt), 171.064 (organized for conservation purposes), 171.065 (organized to provide water supply or sewer services), 171.066 (involved with city natural gas facility), 171.067 (organized to provide convalescent homes for elderly), & 171.068 (organized to provide cooperative housing).

a business interest in solar energy devices;[25] certain homeowners' associations;[26] and emergency medical service corporations.[27]

In 1991, the Legislature shifted the primary basis of the franchise tax profoundly, from capital to "net taxable earned surplus" — *i.e.*, income.[28] Taxable earned surplus was based on an entity's "reportable federal taxable income", with various adjustments and deductions.[29] For example, a corporation's reportable federal taxable income was after federal Schedule C special deductions but before net operating loss deductions, and excluded dividends from foreign affiliates but added officers' and directors' compensation. *Id.* Special deductions were permitted "enterprise projects"[30] and solar energy devices.[31] No new exemptions were created, and the exemption for savings and loan associations was revoked.[32] (The exemption for banks had been repealed in 1984,[33] but the

---

[25] *Id.* § 171.056.

[26] Act of June 1, 1981, 67th Leg. R.S., ch. 752, § 4, 1981 Tex. Gen. Laws 2750, 2758, codified as TEX. TAX CODE § 171.082.

[27] *Id.* § 14, codified as TEX. TAX CODE § 171.083.

[28] Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, §§ 8.01-.27, 1991 Tex. Gen. Laws 134, 152-167. *See* Brandon Janes & Steve Moore, *The New Texas Franchise Tax*, 54 TEX. B.J. 1108, 1108 (1991) ("In effect, the new legislation adds to the previous system of taxing capital a Texas corporate income tax.").

[29] Act of Aug. 13, 1991, 72nd Leg., 1st C.S., ch. 5, § 8.09, adding TEX. TAX CODE § 171.110.

[30] *Id.* § 8.051, amending TEX. TAX CODE § 171.1015.

[31] *Id.* § 8.07, amending TEX. TAX CODE § 171.107(b).

[32] *Id.* § 8.24(2), repealing TEX. TAX CODE § 171.054.

[33] Act of July 3, 1984, 68th Leg., 2nd C.S., ch. 31, art. 3, part B, § 1, 1984 Tex. Gen. Laws 193, 212.

exemption for credit unions remained, and exemptions had been added in 1987 for certain trade show participants[34] and recycling operations.[35])

B

The current franchise tax is the product of further legislative restructuring in 2006,[36] with a few amendments since then. The tax is still based primarily on revenue and only secondarily on capital, and now applies to every for-profit entity doing business or chartered in Texas that is distinct from its owners (*i.e.*, not a sole proprietorship or a general partnership directly owned by an individual),[37] excluding certain passive entities, trusts, estates, escrows, and a few other such entities.[38] But the numerous exemptions created over the years remain.[39] Affiliated entities engaged in a unitary business must report as a group.[40]

---

[34] Act of May 31, 1987, 70th Leg., ch. 778, § 1, 1987 Tex. Gen. Laws 2761, 2761, codified as TEX. TAX CODE § 171.084.

[35] Act of May 29, 1989, 71st Leg., ch. 641, § 3, 1989 Tex. Gen. Laws 2123, 2124, codified as TEX. TAX CODE § 171.085.

[36] Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, 2006 Tex. Gen. Laws 1, 1-40, codified as TEX. TAX CODE § 171 .

[37] The reason for this exclusion is that "a tax on the net incomes of natural persons, including a person's share of partnership and unincorporated association income, must [be] approved... in a statewide referendum". TEX. CONST. art. VIII, § 24(a). We rejected an argument that the franchise tax is such a tax in *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 470 (Tex. 2011).

[38] TEX. TAX CODE §§ 171.001, 171.0002.

[39] *Id.* §§ 171.052-.088.

[40] *Id.* §§ 171.0001(7) (defining "combined group"), 171.0001(17) (defining "unitary business"), & 171.1014 (requiring combined group reporting).

6

The tax is calculated according to the following formula:

Total Revenue

-       General Deduction: the greater of either the Cost of Goods Sold, Compensation, or 30%

=       Margin

x       Percentage of gross receipts from Texas business

=       Taxable Margin

x       Tax Rate (0.5% for entities primarily engaged in wholesale or retail trade, 1% for all others)

=       Franchise Tax

Total Revenue is income reported to the federal IRS with various deductions, limitations, and exceptions.[41] For example, all taxpayers may deduct bad debts expensed for federal income tax purposes[42] and certain flow-through funds.[43] Specific deductions include sales commissions to non-employees,[44] wholesaler rebates to pharmacy cooperatives,[45] payments to artists by live event promotion companies,[46] payments for labor and materials by destination management companies,[47]

---

[41] *Id.* §§ 171.101, 171.1011.

[42] *Id.* § 171.1011(c)(1)(B)(i), (c)(2)(B)(i), (c)(3).

[43] TEX. TAX CODE § 171.1011(f)-(g).

[44] *Id.* § 171.1011(g)(1).

[45] *Id.* § 171.1011(g-4).

[46] *Id.* § 171.1011(g-5).

[47] *Id.* § 171.1011(g-6).

payments to delivery subcontractors by courier and logistics companies,[48] client expenses by management companies,[49] and certain plan payments to health care providers.[50] Lawyers may deduct $500 for each case handled pro bono.[51]

A taxpayer may elect one of three General Deductions.[52] One, the Cost of Goods Sold, includes "all direct costs of acquiring or producing goods",[53] some indirect costs like insurance, utilities, and quality control, and up to 4% of other "indirect or administrative overhead costs".[54] Public lending institutions and lessors of motor vehicles, heavy construction equipment, and rolling stock may include certain other expenses in their Cost of Goods Sold.[55] An alternative, Compensation, includes wages and benefits to owners, partners, officers, directors, and employees, but not independent contractors.[56] The amount per person per year is capped at $300,000.[57] In lieu of either of these deductions, a taxpayer may choose simply to deduct 30% of its Total Revenue.[58]

---

[48] *Id.* § 171.1011(g-7).

[49] TEX. TAX CODE § 171.1011(m-1).

[50] *Id.* § 171.1011(n).

[51] *Id.* § 171.1011(g-3)(3).

[52] *Id.* § 171.101(a).

[53] *Id.* § 171.1012(a)(1), (c).

[54] *Id.* § 171.1012(d), (f).

[55] TEX. TAX CODE § 171.1012(k), (k-1).

[56] *Id.* § 171.1013(b).

[57] *Id.* § 171.1013(c).

[58] *Id.* § 171.101(a)(1)(A).

Subtracting a General Deduction from Total Revenue yields Margin, which must then be apportioned, based on the percentage of the taxpayer's total gross receipts earned from business done in Texas.[59] From the result, Taxable Margin, a taxpayer may deduct part of the cost of a solar energy device[60] and a clean coal project.[61]

The standard Tax Rate is 1%, but for a taxpayer "primarily engaged in wholesale or retail trade", that rate is only 0.5%.[62] To qualify for the lower rate, a taxpayer's retail/wholesale revenue must exceed its revenue from other business and must come mostly from the sale of products produced by others.[63] There are also discounts for small businesses with total revenue below $900,000.[64] And a taxpayer with no more than $10 million total revenue may elect a rate of 0.575% of Total Revenue without taking the General Deduction.[65]

## C

With its 2006 revisions to the franchise tax, the Legislature provided that "[t]he supreme court has exclusive and original jurisdiction over a challenge to the constitutionality of this Act or

---

[59] *Id.* §§ 171.101(a)(2), 171.106(a).

[60] *Id.* § 171.107.

[61] TEX. TAX CODE § 171.108.

[62] *Id.* § 171.002(a), (b).

[63] *Id.* § 171.002(c). The taxpayer also must not provide retail or wholesale utilities.

[64] *Id.* § 171.0021.

[65] *Id.* § 171.1016.

any part of this Act and may issue injunctive or declaratory relief in connection with the challenge."[66] Pursuant to this provision, petitioner Nestle USA, Inc., initiated this proceeding in this Court.

Nestle manufactures and distributes food and beverages in the United States. Although Nestle's business in Texas is confined to wholesale and retail activities, its manufacturing business in other states subjects it to the 1% Texas franchise tax rate, rather than the lower 0.5% rate applicable to wholesalers and retailers. Also, Nestle and its 32 affiliates, required to report as a group, must together choose a General Deduction that does not benefit each. If the entities were allowed to report separately, each could choose the most beneficial General Deduction. And Nestle receives no benefit from other franchise tax deductions and exemptions applicable to other businesses.

Nestle paid its franchise taxes through 2011 without protest to the Comptroller but challenged the constitutionality of the tax in this Court.[67] We held that payment under protest was a jurisdictional prerequisite to its challenge and dismissed the proceeding.[68] Nestle then paid the $8,682,998.99 due for 2012 under protest and re-filed its challenge.

Nestle contends that the franchise tax must be measured by its object, the privilege of doing business in Texas, but because of its many deductions and exemptions, the tax assessed bears no reasonable relationship to the value of the privilege to the taxpayer and treats similarly situated taxpayers differently. For these reasons, Nestle asserts, the franchise tax violates the Texas

---

[66] Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 24, 2006 Tex. Gen. Laws 1, 40.

[67] *In re Nestle USA, Inc.* 359 S.W.3d 207 (Tex. 2012).

[68] *Id.* at 208.

Constitution's Equal and Uniform Clause,[69] as well as the Fourteenth Amendment's Equal Protection and Due Process guarantees.[70] Further, Nestle argues, because the franchise tax is higher for taxpayers whose manufacturing business is outside Texas, the tax discriminates against interstate commerce in violation of the Commerce Clause of the United States Constitution.[71]

**D**

Nestle characterizes its constitutional challenges as both facial and as-applied, though it does not attempt to specify which is which. The State[72] argues that the Court has no jurisdiction to consider Nestle's as-applied challenges, but the State, too, makes no effort to identify them.

*In re Allcat Claims Service, L.P.*, an original proceeding like this one, also involved constitutional challenges to the franchise tax that the petitioner characterized as both facial and as-applied.[73] We reiterated that while the Legislature is empowered to confer original jurisdiction on this Court in cases involving "questions which are of general public interest and call for a speedy determination", it lacks authority to do so in cases for which there is no "strong and special reason for the exercise of this extraordinary original jurisdiction" and cases "dependent upon the

---

[69] *Id.* at 208. TEX. CONST. art. VIII, § 1(a).

[70] U.S. CONST. amend. XIV, § 1.

[71] U.S. CONST. art. I, § 8 ("The Congress shall have power . . . [t]o regulate Commerce . . . among the several States . . . .").

[72] Nestle names as respondents the Comptroller of Texas and the Attorney General of Texas. Joining respondents in their brief, the State calls itself the real party in interest. The positions of the three in the case are identical, and we refer to them together as the State.

[73] 356 S.W.3d 455, 457 (Tex. 2011).

determination of any doubtful question of fact".[74] We held that the legislative grant of "jurisdiction to consider [a] facial challenge to the . . . constitutionality" of the franchise tax was valid but did not extend to "challenges to how the Comptroller assesses, enforces, or collects the franchise tax" in individual situations,[75] the latter being of less public importance and often involving factual disputes.

The State argues that Nestle's as-applied challenges to the franchise tax fall into this latter category simply because they are as-applied. But "the line between facial and as-applied challenges is not so well defined that it has some automatic effect",[76] and in any event, it is not the line we drew in *Allcat*. Nestle's challenges, striking at the foundations of a tax on which the State heavily depends for revenue, affect not only millions of taxpayers but the public at large. The importance to the state fisc of quickly and finally resolving such challenges is obviously the "strong and special reason" the Legislature conferred original, exclusive jurisdiction on this Court.[77] And unlike some of the petitioner's contentions in *Allcat*, Nestle's challenges do not require a resolution of disputed facts; all material facts are established. Based on *Allcat*, we clearly have jurisdiction to consider all Nestle's claims.

To which we now turn: first to the Equal and Uniform challenge; next to Equal Protection; then to Due Process; and finally to the Commerce Clause.

---

[74] *Allcat*, 356 S.W.3d at 461 n.6 (quoting *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930)).

[75] *Id.* at 463, 470-471 (Tex. 2011).

[76] *See In re Cao*, 619 F.3d 410, 439 (5th Cir. 2010) (en banc) (Jones, C.J., concurring in part and dissenting in part) (internal citation and quotations omitted); *see also* Scott A. Keller & Misha Tseytlin, *Applying Constitutional Decision Rules Versus Invalidating Statutes in Toto*, 98 VA. L. REV. 301, 312 (2012) ("courts remain hopelessly befuddled in this area").

[77] *Allcat*, 356 S.W.2d at 461 n.6.

## II

### A

The Texas Constitution has always provided that "[t]axation shall be equal and uniform".[78] Equality and uniformity are characteristics of a relation between or among multiple objects. A $100 tax on each landowner, irrespective of the value of his property, is equal and uniform as a poll tax, but not as an ad valorem tax. The Equal and Uniform requirement does not itself specify the objects on which it operates. It says only that taxation — not taxes — must be equal and uniform, indicating that it is the process, not each individual result, that must satisfy the requirement.

A constitutional provision "must be construed in light of conditions existing at the time it was adopted."[79] We have found nothing in the history of the adoption of the Equal and Uniform Clause in 1845, or in any of the several Constitutions since, to indicate its derivation or to illumine the framers' and ratifiers' intentions as to its meaning. In American law, the first use of the phrase "equal and uniform" with reference to taxation appears to have been in the Tennessee Constitution of 1796.[80] Although it became popular in the nineteenth century for states to adopt some

---

[78] TEX. CONST. art. VIII, § 1(a); TEX. CONST. OF 1876, art. VIII, § 1; TEX. CONST. OF 1869, art. XII, § 19; TEX. CONST. OF 1866, art. VII, § 27; TEX. CONST. OF 1861, art. VII, § 27; TEX. CONST. OF 1845, art. VII, § 27.

[79] *In re Allcat Serv., L.P.*, 356 S.W.3d 455, 466 (Tex. 2011) (citation omitted).

[80] *See* 2 WADE NEWHOUSE, CONSTITUTIONAL UNIFORMITY AND EQUALITY IN STATE TAXATION 1704 (2d ed. 1984); William L. Matthews, Jr., *The Function of Constitutional Provisions Requiring Uniformity in Taxation*, 38 KY. L.J. 31, 41 (1949).

constitutional requirement for tax uniformity,[81] the genesis of the idea is obscure.[82] One

commentator writes:

> These uniformity provisions in the state constitutions had their immediate origins in an attempt to remove inequalities resulting from adoption by the states of the general property tax with its ever-expanding tax base and, in some instances, in the mere acceptance of such provisions from other states. They emerged by way of constitutional limitations rather than by statute because their origin coincided with a general movement to restrict the power of the legislatures at a time when the country was undergoing great growth in land settlement and in the initial change from an agricultural to a commercial and industrial economy.[83]

The best indication of the meaning of Texas' Equal and Uniform Clause lies in the provisions

accompanying it. The 1845 Constitution provided:

> Taxation shall be equal and uniform throughout the State. All property in this State shall be taxed in proportion to its value, to be ascertained as directed by law; except such property as two-thirds of both Houses of the Legislature may think proper to exempt from taxation. The Legislature shall have power to lay an income tax; and to tax all persons pursuing any occupation, trade, or profession. Provided, that the term occupation, shall not be construed to apply to pursuits either agricultural or mechanical.[84]

---

[81] One scholar notes that while only six of the original states had constitutional provisions regarding uniform taxation, by the end of the nineteenth century, 41 of 44 did. *See* NEWHOUSE, *supra* note 81 at 1716; *See also* Matthews, *supra* note 80 at 43. But the provisions "var[ied] considerably in their phraseology". THOMAS M. COOLEY, THE LAW OF TAXATION § 253 (4th ed. 1924). The types of provisions are categorized in various ways. Cooley lists "[v]ery general provisions", "[p]rovisions requiring taxes to be in 'proportion' or 'proportional' to value", "[p]rovisions merely requiring taxes to be uniform", "[p]rovisions requiring taxes to be uniform 'upon the same class of subjects'", and "[p]rovisions requiring taxes to be both 'equal' and 'uniform'". *Id. See also* 1 WADE NEWHOUSE, CONSTITUTIONAL UNIFORMITY AND EQUALITY IN STATE TAXATION 1, 17-18 (2d ed. 1984) (listing twelve types of uniformity clause).

[82] *See* Matthews, *supra* note 80, at 49 ("[H]istorically the origins of the idea of uniformity in taxation are obscure.").

[83] *Id.* at 49-50.

[84] TEX. CONST. OF 1845, art. VII, § 27.

A virtually identical provision was included in the Constitutions of 1861, 1866, and 1869.[85] The Constitution of 1876 expanded the provision into two sections, adding that "[a]ll occupation taxes shall be equal and uniform upon the same class of subjects", and replacing the authorization of the Legislature to exempt property from taxation with specific, exclusive exemptions.[86] The sections have since been rewritten and now provide, as relevant for our purposes:

>Sec. 1. (a) Taxation shall be equal and uniform.

>(b) All real property and tangible personal property in this State, unless exempt as required or permitted by this Constitution, . . . shall be taxed in proportion to its value, which shall be ascertained as may be provided by law.

>(c) The Legislature may . . . impose occupation taxes . . . [and] may also tax incomes of both natural persons and corporations . . . . Persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax.

>Sec. 2. (a) All occupation taxes shall be equal and uniform upon the same class of subjects . . . .[87]

---

[85] TEX. CONST. OF 1861, art. VII, § 27; TEX. CONST. OF 1866, art. VII, § 27; TEX. CONST. OF 1869, art. XII, § 19.

[86] "SECTION 1. Taxation shall be equal and uniform. All property in this State, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law. The Legislature may impose a poll tax. It may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State. It may also tax incomes of both natural persons and corporations, other than municipal, except that persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax . . . .

"SEC. 2. All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax; but the Legislature may, by general laws, exempt from taxation public property used for public purposes; actual places of religious worship; places of burial not held for private or corporate profit, all buildings used exclusively and owned by persons or associations of persons for school purposes, (and the necessary furniture of all schools), and institutions of purely public charity; and all laws exempting property from taxation other than the property above mentioned, shall be void."

TEX. CONST. art. VIII, §§ 1-2.

[87] TEX. CONST. art. VIII, §§ 1(a)-(c), 2(a).

The two sections also provide for numerous tax exemptions.[88]

> "No provision in the constitution should be read or construed in isolation."[89]

> The Constitution must be read as a whole, and all amendments thereto must be considered as if every part had been adopted at the same time and as one instrument, and effect must be given to each part of each clause . . . . Different sections, amendments, or provisions of a Constitution which relate to the same subject-matter should be construed together and considered in the light of each other.[90]

We read the provisions following the Equal and Uniform Clause as examples, not exceptions. A property tax is equal and uniform only if it is in proportion to property value. But exemptions do not destroy equality and uniformity, nor do occupation tax classifications, and even an income tax, with its characteristic adjustments and deductions, can be equal and uniform.

Accordingly, we have held that taxes on real and personal property must be uniform across all types of property,[91] but that "[t]he Legislature's authority to make classifications in levying occupation, use, and sales taxes unquestionably is broader than its authority to do so with respect to ad valorem taxes".[92] We have allowed occupation taxes to differ between occupations, upholding a tax that was higher for oil wholesalers than for other wholesalers.[93] We explained that "[m]erchants may be divided into wholesalers and retailers, and, if there be reasonable grounds, these

---

[88] *Id.*

[89] *Vinson v. Burgess*, 773 S.W.2d 263, 265 (Tex. 1989).

[90] *Collingsworth Cnty. v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931) (citations omitted).

[91] *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 935 (Tex. 1996) (citing *Lively v. Mo., K. & T. Ry.*, 120 S.W. 852, 856 (Tex. 1909)).

[92] *Enron Corp.*, 922 S.W.2d at 936.

[93] *Tex. Co. v. Stephens*, 103 S.W. 481, 485 (Tex. 1907).

16

may be further divided according to the particular classes of business in which they may engage."[94] We have also held that an occupation tax is equal and uniform even though the tax increased with each additional store in a chain because, "[a]s the number of stores increases, the differences in the methods of doing business increase."[95] And "we have long recognized that exact uniformity and equality is unattainable."[96]

It is important to note that classifying taxpayers for purposes of an occupation tax is not an exception to the Equal and Uniform Clause but a consequence of it. The value of an occupation derives not from the fact that it involves activity — a mere expenditure of energy — but from its nature, pursuits, and rewards. In that sense, valuation is the same as for real property. Just as the value of a parcel of land depends on it characteristics, like location, use, and potential, so the value of an occupation depends on its nature.

One scholarly treatise concludes that while constitutional uniform taxation provisions generally require that property taxes be based on property values without distinctions, for nonproperty taxes, the uniformity which is required has always been stated as being a uniformity within classes.[97] Consistent with this conclusion, we note that the Constitutional Convention of 1845 considered and rejected an amendment to the Equal and Uniform Clause that would have required

---

[94] *Id.*

[95] *Hurt v. Cooper*, 110 S.W.2d 896, 903 (Tex. 1937).

[96] *Enron Corp.* 922 S.W.2d at 935.

[97] NEWHOUSE, *supra* note 80 at 1723.

any license or income tax to be "a uniform ad valorem tax" based on the amount of money involved.[98]  The framers thus did not preclude classifications for all non-property taxes.

**B**

The Constitution does not mention a franchise tax, but it is very similar to an occupation tax. In fact, *Black's Law Dictionary* defines each the same way: a "tax imposed [for or on] the privilege of carrying on a business".[99]  That privilege cannot be valued apart from its use, whether in an occupation or in a business, to the extent the two can be distinguished.  It follows that classifications necessary to assure equality and uniformity in occupation taxes are equally necessary for franchise taxes.

From the implementation of the Texas franchise tax, nothing could be clearer.  Except for its first four years as a poll tax, from 1893 to 1897, it has been structured on classifications.[100]  In 1897, there were only two: whether a corporation was domestic or foreign, and the amount of its capital.[101]  To these the Legislature added several exemptions in 1907.[102]  Over the years, the Legislature increased the number of exemptions, added adjustments and deductions, and shifted the

---

[98] Journals of the Convention, Assembled at the City of Austin on the Fourth of July, 1845, for the Purpose of Framing a Constitution for the State (Austin, Tex., 1845) ("And further provided, That such income or license tax shall not exceed in amount what would be a uniform ad valorem tax upon the sum taxed as income, or stock vested in such occupation, trade or profession").

[99] *Compare* BLACK'S LAW DICTIONARY 1595 (9th ed. 2009) (franchise tax definition) *with id.* at 1596 (occupation tax definition).

[100] *Supra* notes 4-5 and accompanying text.

[101] *Supra* notes 5-6 and accompanying text.

[102] *Supra* notes 9-10 and accompanying text.

basis of the tax from capital to income. But while the differentiations made in the application of the tax have unquestionably increased in complexity, their nature as classifications to assist in achieving tax equality and uniformity has not.

Four other states — Louisiana, Mississippi, Nevada, and West Virginia — have constitutional tax uniformity provisions similar enough to ours to offer guidance.[103] All four interpret their provisions to allow classifications in taxes on the privilege of doing business.[104]

## C

Having concluded that the Equal and Uniform Clause permits classifications in the franchise tax, we next consider what limitations the Clause imposes on the Legislature in providing such classifications. The State argues that "the Legislature has wide latitude to pursue multiple policy goals through the creation of rational classifications within tax legislation."[105] We think the argument cuts much too wide a swath; it would reduce the Equal and Uniform Clause to a

---

[103] LA. CONST. ART. 7 § 4(A) ("Equal and uniform taxes may be levied on net incomes, and these taxes may be graduated according to the amount of net income."); MISS. CONST. art. IV, § 112 ("Taxation shall be uniform and equal throughout the state. All property not exempt from ad valorem taxation shall be taxed at its assessed value."); NEV. CONST. art. 10, § 1(1) ("The legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory, except mines and mining claims, which shall be assessed and taxed only as provided in section 5 of this article."); W. VA. CONST. art. 10, § 1 ("[T]axation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value").

[104] *Mire v. City of Lake Charles*, 540 So.2d 950, 956 (La. 1989) (upholding a tax on attorneys' gross receipts against the challenge that the minimum and maximum set on this tax discriminated against small practitioners); *Peterson v. Sandoz*, 451 So.2d 216 (Miss. 1984) (upholding a tax imposed on dealers of bail bonds but not other types of bonds); *Edwards v. City of Reno*, 742 P.2d 486 (Nev. 1987) (upholding a tax that applied differently to peddlers than to solicitors because peddlers are more mobile and thus likely to avoid other types of taxes); *Appalachian Power Co. v. State Tax Dep't*, 466 S.E.2d 424, 447 (W.Va. 1995) ("For taxes other than those levied on property, [the constitution] merely requires . . . that taxes be equal within each class of persons or businesses taxed, and (presumably) that there be some reasonable basis for the Legislature's classification scheme.").

[105] Brief for Respondent 1.

prohibition against irrational legislation. The Legislature may pursue policy goals through tax legislation, but only goals related to the taxation. The franchise tax may be used to advance policies relating to doing business in Texas, but it cannot be used, for example, to circumvent the requirement that the ad valorem property tax be based strictly on property value. Further, tax classifications must not only be rational but must attempt to group similar things and differentiate dissimilar things. Further, the franchise tax's classifications must relate to differences in doing business that affect the value of the privilege. "The granting of the privilege to transact business in this state confers economic benefits, including the opportunity to realize gross income and the right to invoke the protection of local law. The Texas franchise tax is a tax on the value of this privilege."[106] The Tax Commission responsible for developing the 2006 amendments to the franchise tax confirmed that purpose by stating: "The clear intention of the law's original framers — that the franchise tax should be imposed in exchange for the state's liability shield — remains the guiding light for the Commission's recommendation."[107] For this reason, the Commission explained, it rejected net worth as a basis for the franchise tax because net worth is not a measure of a business's activity in Texas.[108]

---

[106] *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 270 (Tex. 1979) (citations omitted). *See also Gen. Dynamics Corp. v. Bullock*, 547 S.W.2d 255, 257 (Tex. 1976) (stating that it "was the purpose of the Legislature to levy against the corporation a tax commensurate with the value of the privilege granted") (citation and internal quotation marks omitted).

[107] TEX. TAX REFORM COMM'N, TAX FAIRNESS: PROPERTY TAX RELIEF FOR TEXANS 18 (2006).

[108] *Id*.

*Bullock v. Sage Energy Co.*[109] provides an example of an unreasonable classification in the franchise tax. By rule, intangible development costs ("IDCs") were excluded from capital, on which the franchise tax was based at the time, if expensed on the taxpayer's books, but under federal law, Sage Energy, a publicly traded company, was required to capitalize IDCs.[110] As a result of a federal accounting requirement, unrelated to doing business in Texas, and not imposed on other companies engaged in the same business, Sage Energy's franchise tax was higher.[111] The court held that this violated the Equal and Uniform Clause.[112] Nestle points to language in the court's opinion — that "taxation cannot be uniform unless the value of all property is ascertained by the same standard"[113] — as supporting its position that the Equal and Uniform Clause does not permit any classifications in the franchise tax. But the court's point in *Sage Energy* was not that all classifications in the franchise tax are impermissible, only that a classification based on federal accounting requirements was invalid because it bore no relation to doing business in Texas.[114]

Nestle argues that no classification or differentiation in the application of the franchise tax, unrelated to the value of the privilege of doing business in Texas, is permitted by the Equal and Uniform Clause. While we agree that a classification in a tax must be related to the object of the tax,

---

[109] 728 S.W.2d 465 (Tex. App.–Austin 1987, writ ref'd, n.r.e.).

[110] *Id.* at 466-467

[111] *Id.*

[112] *Id.* at 467-468 (citation omitted).

[113] *Id.* at 468.

[114] *Id.*

21

we believe that the Legislature must have discretion in structuring tax laws. This is especially true when the object of the tax — occupations or the privilege of doing business in the state — is not easily or exactly valued. "There is always a presumption of constitutional validity with regard to legislation and it is especially strong in respect to statutes relating to taxation."[115] With this in mind, we turn to Nestle's particular challenges.

## D

Nestle attacks classifications in the current franchise tax. For example, it argues, there is "no apparent reason" to include employee wages in the General Deduction for Compensation but exclude payments to independent contractors for the same work. But the Legislature could certainly conclude that employers' burdens — like compensation, unemployment insurance, and vicarious liability — are greater than those for a business whose work is done by independent contractors. Nestle argues that a taxpayer whose Texas business is exclusively wholesale and retail trade should not be taxed at a higher rate because it has a manufacturing business outside Texas. But the Legislature could conclude, as the Tax Commission indicated, that such a taxpayer's Texas business would benefit from its manufacturing activities out-of-state.[116] For the same reason, the Legislature could conclude that affiliated entities should be required to file as a group.

---

[115] *Vinson v. Burgess*, 773 S.W.2d 263, 266 (Tex. 1989) (internal quotation marks omitted); *see also Walters v. City of St. Louis*, 347 U.S. 231, 237-238 (1954) (noting that, when a state tax's validity is challenged, "every presumption in its favor is indulged") (citation and internal quotation marks omitted).

[116] TEX. TAX REFORM COMM'N, TAX FAIRNESS: PROPERTY TAX RELIEF FOR TEXANS 19 n.4 (2006) ("[B]usinesses . . . engaged primarily in wholesale or retail activities[] would pay 0.5% in recognition of the low profit margins that are basic to the industry"). *See also Great Atl. & Pac. Tea Co. v. Grosjean,* 301 U.S. 412, 424-425 (1937) (explaining that out-of-state stores increase the value of the privilege of doing business within a state by giving a competitive advantage to chain stores within the state).

22

Nestle complains that the myriad exemptions and special deductions allowed by the franchise tax are arbitrary and not reasonably related to the privilege of doing business in Texas. Nestle points to the exclusion from Cost of Goods Sold allowed for rental expenses of heavy construction equipment, motor vehicles, and rolling stock. But in the House floor debate in 2006, legislators expressed concern that lessors of construction equipment would be treated unequally without the exclusion because they do not sell goods and have few employees, and their General Deduction for Cost of Goods Sold or Compensation would be unfairly low.[117] What Nestle criticizes as a departure from uniformity is actually an attempt to treat like taxpayers alike.

Nestle does not challenge each and every deduction and exemption. It argues that their inclusion in the franchise tax structure shows that the tax is not reasonably related to its object, the privilege of doing business in Texas. From the examples it cites, we disagree. Rather, we conclude that the Legislature's structuring of the franchise tax is reasonably related to its object. Nestle has not established that the franchise tax violates the Equal and Uniform Clause.

### III

Nestles concedes, and we agree, that a failure of its challenge based on the Equal and Uniform Clause forecloses its Equal Protection challenge. The Fourteenth Amendment's Equal Protection Clause does not require that property taxes be imposed without classification.[118] "It

---

[117] *See, e.g.,* Debate on Tex. H.B. 3 on the Floor of the House, 79th Leg., 3rd C.S., Amendment No. 37, Part 6, minute 29 (April 24, 2006) ("these capital intensive industries deserve the same treatment that other capital intensive industries get"), *available at* http://www.house.state.tx.us/video-audio/chamber/#79.

[118] *Allegheny Pittsburgh Coal v. Webster Cnty.*, 488 U.S. 336, 344-345 (1989) (explaining that the Equal Protection Clause would allow a state to "divide different kinds of property into classes and assign to each class a different tax burden" but that the West Virginia equal and uniform clause required that "all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value.").

simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."[119] The Equal and Uniform Clause is more strict. Having concluded that the Legislature had a rational basis for structuring the franchise tax the way it did, we hold that it did not violate Equal Protection in doing so.

**IV**

Due Process requires that "the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state."[120] The relation must be to the activity itself, not merely to the company.[121] We have concluded that classifications in the franchise tax are reasonably related to the privilege of doing business in Texas. Our analysis is similar to that employed by the United States Supreme Court in *Ford Motor Co. v. Beauchamp*, where a company complained that it was paying more franchise tax because of its manufacturing outside Texas even though it did no manufacturing within Texas.[122] Noting that the Texas franchise tax "is obviously payment for the privilege of carrying on business in Texas", the Supreme Court held that the franchise tax did not violate due process because in "a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state."[123] For the same reasons, we conclude that Nestle's Due Process challenge fails.

---

[119] *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted).

[120] *Wis. v. J.C. Penney Co.*, 311 U.S. 435, 444 (1940).

[121] *Allied-Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 767, 778 (1992).

[122] 308 U.S. 331, 333-334 (1939).

[123] *Id*. at 334, 336.

24

**V**

The United States Supreme Court has long held that the Commerce Clause's express grant to Congress of the power to "regulate Commerce . . . among the several states" also contains a negative command – known as the negative or dormant Commerce Clause – that prohibits certain state taxation even when Congress has failed to legislate on the subject.[124] In this case, the higher tax rate for manufacturing would violate the dormant Commerce Clause if it: "(1) applies to an activity lacking a substantial nexus to the taxing State; (2) is not fairly apportioned; (3) discriminates against interstate commerce; or (4) is not fairly related to the services provided by the State."[125] Nestle claims that the manufacturing rate discriminates against interstate commerce and is not fairly related to the services provided by Texas.

The manufacturing rate does not discriminate against interstate commerce. Taxes do not discriminate when the differing rate stems "solely from differences between the nature of their businesses, not from the location of their activities."[126] That is the case here. Location is not the basis for different treatment because in-state companies that manufacture will pay the same rate as Nestle and out-of-state companies that do only wholesaling and retailing will qualify for the lower rate. Nestle's discrimination argument is similar to the argument that failed in *Exxon Corp. v.*

---

[124] *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-80 (1995); *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310-311 (1994); *Quill Corp v. North Dakota*, 504 U.S. 298, 309 (1992).

[125] *Jefferson Lines, Inc.*, 514 U.S. at 179-80 (explaining and applying the four-part test first adopted in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977)); *Barclays Bank*, 512 U.S. at 310-311 (1994).

[126] *Amerada Hess Corp.v. Dir., Div. Of Taxation*, 490 U.S. 66, 78 (1989) (citation omitted).

*Governor of Maryland*.[127] *Exxon* held that a law prohibiting oil producers from retailing in Maryland does not discriminate against interstate commerce. An outright prohibition is more suspect than a higher tax rate. The Supreme Court based its *Exxon* decision in part on the fact that interstate retailers that do not produce are free to compete with local retailers.[128] That is also true in this case.

The manufacturing rate is fairly related to the services provided by Texas. In *Oklahoma Tax Commission v. Jefferson Lines, Inc*., the Supreme Court stated that the fair relation test "asks only that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State".[129] The Supreme Court upheld a state bus-ticket tax that applied the same rate to the ticket price regardless of how much of that trip would occur within the state.[130] The Court explained that it need not do a detailed accounting of the services provided or ensure that the tax is limited to offsetting the public costs generated by the taxed activity.[131] Just as the tax in *Jefferson Lines* did not need to precisely align the tax rate with the value of the roads provided by the state, the franchise tax need not precisely align the tax rate with the value of the Privilege. It is enough that manufacturing outside of the state will often increase the value of doing business within the state,

---

[127] 437 U.S. 117, 125-129 (1978).

[128] *Id*. at 126.

[129] 514 U.S. 175, 200 (1995) (citation omitted).

[130] *Id*. at 199–200.

[131] *Id*. at 199.

just as it was enough that out-of-state stores in a chain often increase the "advantages and capacities" of stores within the state.[132]

*     *     *

Accordingly, Nestle's petition is denied.

_____

Nathan L. Hecht
Justice

OPINION DELIVERED: October 19, 2012

_____

[132] *Great Atl. & Pac. Tea Co. v. Grosjean*, 301 U.S. 412, 425 (1937).