

February 26, 2015

The Honorable Joseph C. Pickett
Chair, Committee on Transportation
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. KP-0004

Re: The authority of a county to form and operate transportation reinvestment zones, tax increment reinvestment zones, or county energy transportation reinvestment zones in various circumstances (RQ-1215-GA)

Dear Representative Pickett:

You seek clarification regarding a county's formation and operation of various types of reinvestment zones after the issuance of Attorney General Opinion GA-1076.[1] In that opinion, this office concluded that "[a] county's use of tax increment financing to fund transportation projects in a county energy transportation reinvestment zone could be subject to challenge under the equal and uniform taxation requirement in article VIII, section 1(a) of the Texas Constitution." Tex. Att'y Gen. Op. No. GA-1076 (2014) at 4.

Article VIII, section 1(a) provides that "[t]axation shall be equal and uniform." TEX. CONST. art. VIII, § 1(a). Under the equal and uniform provision, "[t]axes are said . . . to be 'equal and uniform,' when no person nor class of persons in the taxing district . . . is taxed at a different rate than are other persons in the same district upon the same value or the same thing." *Norris v. City of Waco*, 57 Tex. 635, 641, 1882 WL 9558, at *5 (1882). The equal and uniform mandate requires that all persons falling within the same class be taxed alike, so that a tax imposed by a taxing entity within its territory that equally and uniformly operates on all property in the taxing unit is not constitutionally infirm. *See id.*; *see also Smith v. Davis*, 426 S.W.2d 827, 833–34 (Tex. 1968) (recognizing that the equal and uniform mandate requires that all persons falling within the same class be taxed alike); *Sharp v. Caterpillar, Inc.*, 932 S.W.2d 230, 240 (Tex. App.—Austin 1996, writ denied) (same).

In your request letter, you assert that Opinion GA-1076 is inconsistent with prior attorney general opinions and re-urge our consideration of a number of questions about county authority with respect to transportation reinvestment zones (TRZs) and county energy transportation

[1]*See* Letter from Honorable Joseph C. Pickett, Chair, House Select Comm. on Transp. Funding, Expenditures & Fin., to Honorable Greg Abbott, Tex. Att'y Gen. at 1 (Aug. 21, 2014), https://www.texasattorneygeneral.gov/opinion/requests-for-opinion-rqs ("Request Letter").

reinvestment zones (CETRZs) under sections 222.107 and 222.1071, respectively, of the Transportation Code, and tax increment reinvestment zones (TIRZs) under section 311.003 of the Tax Code. *See* Request Letter at 2–3; *see generally* Tex. Att'y Gen. Op. Nos. GA-1076 (2014) at 1 (describing CETRZs), GA-0981 (2012) at 1–2 (describing TRZs), GA-0953 (2012) at 1–2 (discussing TIRZs). Yet, though each opinion to which you refer is limited to the issues relevant to the particular request, this office has consistently cast doubt on the tax increment funding mechanism that forms the basis of these types of county-level entities.

This office first considered a tax increment reinvestment zone under article VIII, section 1(a) in Opinion MW-337. *See* Tex. Att'y Gen. Op. No. MW-337 (1981). The Tax Increment Financing Act of 1979, at issue in MW-337, authorized municipalities to engage in tax increment financing. *Id.* at 1–2. Fundamentally, tax increment financing involves a base value, which is the amount of property values frozen as of a particular date within a district or "zone," and a captured increment value, which is the enhanced amount of the same property values above the frozen value in subsequent years. *See generally El Paso Cnty. Cmty. Coll. Dist. v. City of El Paso*, 698 S.W.2d 248, 249–50 (Tex. App.—Austin 1985) (describing tax increment financing), *rev'd on other grounds*, 729 S.W.2d 296 (Tex. 1986); *see also* Tex. Att'y Gen. Op. No. GA-0549 (2007) at 2–3 (same). Though a taxing unit's tax levy may be the same percentage for all appraised value for property within a zone and property outside of the zone, the portion of the tax levy on the captured increment is not used for the taxing entity's general revenue fund but is instead pledged or dedicated to funding particular projects as authorized by statute. *See generally* Tex. Att'y Gen. Op. No. GA-0549 (2007) at 2–3. In Opinion MW-337, this office described the tax levy within a zone as "[a]n ad valorem tax for general municipal purposes and a special assessment for the special purpose of improving a particular district . . . ." Tex. Att'y Gen. Op. No. MW-337 (1981) at 5. Opinion MW-337 noted that the amount of the captured tax increment would be deducted from the municipal tax burden that property in the zone would otherwise share with property outside of the zone. *See id.* The result was a disparate tax treatment of property in the same class: of all real property located within the municipality, property located outside of the zone "would have 100% of its value taxed to meet the ordinary needs of the city, but [zone] property would have only a part of its value taxed for that purpose, causing an unequal distribution of the ad valorem tax burden." *Id.* Because of this disparity, MW-337 concluded that the Tax Increment Financing Act was unconstitutional under the equal and uniform provision of the Texas Constitution without an enabling constitutional amendment. *See id.*

That enabling constitutional amendment was approved by the voters with the adoption of article VIII, section 1-g. Article VIII, section 1-g was passed in 1981 and consists of two sections. *See City of El Paso*, 729 S.W.2d at 296–97. Article VIII, section 1-g(a) provides that:

> The legislature by general law may authorize *cities, towns, and other taxing units* to grant exemptions or other relief from ad valorem taxes on property located in a reinvestment zone for the purposes of encouraging development or redevelopment and improvement of the property.

TEX. CONST. art. VIII, § 1-g(a) (emphasis added). Article VIII, section 1-g(b) provides that:

> The legislature by general law may authorize an incorporated *city or town* to issue bonds or notes to finance the development or redevelopment of an unproductive, underdeveloped, or blighted area within the city or town and to pledge for repayment of those bonds or notes increases in ad valorem tax revenues imposed on property in the area by the city or town or other political subdivision.

*Id.* art. VIII, § 1-g(b) (emphasis added). This office has distinguished the two provisions characterizing section 1-g(a) as authorizing tax exemptions or other tax relief and section 1-g(b) as authorizing the Legislature to provide for tax increment financing. Tex. Att'y Gen. Op. No. GA-0514 (2007) at 5–8; *see* Tex. Att'y Gen. Op. No. GA-0304 (2005) at 2 (noting that chapter 312 of the Tax Code, authorizing municipal tax abatements, is the enabling legislation for article VIII, section 1-g(a)).

Subsequent to the adoption of article VIII, section 1-g(b), this office considered a county's authority to issue tax increment financing bonds. *See* Tex. Att'y Gen. Op. No. GA-0953 (2012) at 1–2. Opinion GA-0953 involved an amendment to the statute at issue in MW-337 that allowed counties to designate an area within the county as a reinvestment zone. *Id.* at 2. The amended statute did not expressly authorize counties to issue bonds or notes secured by tax increment revenue. *See id.* This lack of authority to issue bonds resulted in the conclusion that a county was not authorized to issue tax increment financing bonds. *Id.* In making the statement "the authority to levy taxes that support a tax increment fund is distinct from the authority to issue bonds," this office recognized that a county could contribute its *general revenue funds* to a tax increment fund created by another entity but distinguished that authority from any implied authority to issue bonds. *Id.* at 3; *see Canales v. Laughlin*, 214 S.W.2d 451, 453 (Tex. 1948) (noting that counties have only the powers granted "expressly or by necessary implication" in the Texas Constitution or statutes). It was not a statement indicating that any authority of a county to issue bonds was the impediment to a county's creation of a tax increment zone. *See* Tex. Att'y Gen. Op. No. GA-1076 (2014) at 3. Because the statute was dispositive to the question presented, Opinion GA-0953 did not need to address any constitutional impediments to a county engaging in its own tax increment financing. *See* Tex. Att'y Gen. Op. Nos. GA-0953 (2012) at 2; GA-0981 (2012) at 2 n.2 (clarifying that Opinion GA-0953 was decided on statutory grounds only and stating that "[n]othing in GA-0953 suggests that a county with statutory authority to issue ad valorem tax increment bonds may do so in the absence of clear constitutional authority").

The constitutional question reserved in GA-0953 was addressed in Opinion GA-0981. In Opinion GA-0981, this office concluded that a county was not authorized to issue tax increment financing bonds secured by a pledge of a county's tax increment revenue because the scheme violated the equal and uniform requirement of article VIII, section 1(a). Tex. Att'y Gen. Op. No. GA-0981 (2012) at 3. Opinion GA-0981 considered the tax disparity described in MW-337 and determined that section 222.107 of the Transportation Code similarly resulted in property within a zone being taxed differently from property located outside the zone. *Id.* at 2–3. It also noted that as article VIII, 1-g(b), authorizing cities to engage in tax increment financing, did not include counties, the amendment did not serve to exempt counties from the equal and uniform requirement

as it did cities so that section 222.107 of the Transportation Code would likely be unconstitutional if challenged under article VIII, section 1(a).[2] *Id.*; *see also infra* p. 5 and note 3.

Finally, this office issued Opinion GA-1076 which prompted this, your most recent request. Tex. Att'y Gen. Op. No. GA-1076 (2014); Request Letter at 1. Opinion GA-1076 addressed section 222.1071 of the Transportation Code. Tex. Att'y Gen. Op. No. GA-1076 (2014). Section 222.1071 authorizes a county to create a county energy transportation reinvestment zone and use the tax increment revenue to secure matching funds from the state's Transportation Infrastructure Fund. *See id.* at 1; *see also* TEX. TRANSP. CODE ANN. § 222.1071(i) (West Supp. 2014). Section 222.1071 expressly prohibits counties from issuing bonds. TEX. TRANSP. CODE ANN. § 222.1071(j) (West Supp. 2014). Despite that prohibition, Opinion GA-1076 determined that section 222.1071 would likely fail if challenged under the equal and uniform requirement in article VIII, section 1(a). *See* Tex. Att'y Gen. Op. No. GA-1076 (2014) at 2–3. The opinion affirmatively stated that the constitutional infirmity, as was the case in GA-0981, was the disparate tax treatment of property located within the zone versus property located outside of the zone. *Id.* at 2.

While each of your specific questions inquire about several different types of entities, all of your questions implicate the fundamental issue of whether a county has authority to pledge a captured increment of ad valorem taxes to fund a county tax increment reinvestment zone. To address that issue, we consider again the authority granted by article VIII, section 1-g(b) of the Texas Constitution.

The fundamental rule in the interpretation of a constitutional provision is to give effect to the intent of the legislators who proposed it and the people who adopted it. *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009). Courts look to the text of a constitutional provision to give effect to its plain language. *Id.* In determining the framer's and voter's intent, a constitutional provision is construed in light of the conditions existing at the time of its adoption. *In re Nestle USA, Inc.*, 387 S.W.3d 610, 618 (Tex. 2012) (orig. proceeding). "The meaning of a constitutional provision is fixed when it is adopted . . . ." *Cramer v. Sheppard*, 167 S.W.2d 147, 154 (Tex. 1942) (orig. proceeding).

By its express language, article VIII, section 1-g(b) applies to only "an incorporated city or town." TEX. CONST. art. VIII, § 1-g(b); *see* Tex. Att'y Gen. Op. No. GA-0514 (2007) at 5–8 (discussing distinction between sections 1-g(a) and 1-g(b), which were adopted in the same legislative session); *cf.*, TEX. CONST. art. VIII, § 1-g(a). The difference in language between sections 1-g(a) and 1-g(b) indicates that the Legislature knew how to include taxing units other than cities or towns in its grant of authority. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 885 (Tex. 2000) (relying on the principle of statutory construction that the Legislature knows how to enact laws effectuating its intent). But it did not do so in article VIII, section 1-g(b). Moreover, counties, as "other political subdivision[s]," were authorized by the amendment to only participate in tax increment financing as established by a municipality. *See* Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 4, § 10, 1981 Tex. Gen. Laws 45, 49–50; *see generally City of El Paso*, 729 S.W.2d at 297–98 (recognizing that article VIII, section 1-g(b) provides for the

---

[2]A proposed constitutional amendment to grant authority to counties was defeated by the voters in 2011. *See* Tex. Att'y Gen. Op. Nos. GA-1076 (2014) at 2 (noting rejection), GA-0981 (2012) at 3 (same).

participation by political subdivisions in the city's tax increment financing plan). Thus, the language of article VIII, section 1-g(b) grants authority to cities that it does not grant to counties.

We received briefing in connection to your request letter that argues article VIII, section 1-g(b) makes no express mention of tax increment financing. *See* Brief from C. Brian Cassidy, Locke Lord, L.L.P. at 4 (Sept. 19, 2014) (on file with the Op. Comm.). The argument is that just as cities have been utilizing tax increment financing based only on statutory authorization without benefit of a constitutional amendment, so too may counties utilize such financing based on statutory authority.[3] *See id.* at 4. Although article VIII, section 1-g(b) does not use the term "tax increment financing," the circumstances of its adoption support a construction of the section as a grant of authority for tax increment financing limited to only municipalities. The Legislature proposed article VIII, section 1-g(b) in response to the issuance of Attorney General Opinion MW-337 (1981), which concluded that a 1979 law authorizing municipalities to engage in tax increment financing violated the Texas Constitution's equal and uniform taxation provision.[4] Tex. Att'y Gen. Op. No. MW-337 (1981) at 11. Contemporaneous with the election, a publication for voters analyzing proposed SJR 8 described the tax increment financing mechanism in cities and indicated that its purpose was to provide constitutional support to the mechanism at issue in MW-337.[5] A similar publication reiterated the fact that SJR 8 was proposed in direct response to Opinion MW-337 and stated that the legislation implementing article VIII, section 1-g(b) "authorize[d] a city or town to designate an area within its jurisdiction as a reinvestment zone, redevelop property in the zone, and finance the redevelopment by bonds or notes payable solely from tax increments from the reinvestment zone."[6] These publications indicate that the proposed amendment was understood by the voters to provide a constitutional basis to support a municipality's use of tax increment financing to develop or redevelop certain municipal areas.

The Legislature that framed the proposed amendment evidenced a similar intent. In the same legislative session in which it adopted SJR 8, the Legislature enacted enabling legislation for the proposed amendment, which specifically authorized municipalities to create reinvestment zones, issue tax increment bonds or notes, and deposit tax increments into the tax increment fund. *See* Act of Aug. 10, 1981, 67th Leg., 1st C.S., ch. 4, § 9, 1981 Tex. Gen. Laws 45, 49. It contained no similar authority for counties. *See id.* The enabling legislation is a statement, contemporaneous

---

[3]We disagree with this argument. While statutes may grant counties the authority to create a tax increment reinvestment zone and use the increased tax revenue for county zone projects as authorized by statute, we have previously concluded those statutes likely violate the constitution. *See supra* at 3–4. Statutes authorizing municipal use of tax increment zones are not unconstitutional under the equal and uniform requirement in article VIII, section 1(a) only because article VIII, section 1-g(b) serves as an exception to that requirement. *See* Tex. Att'y Gen. Op. Nos. GA-0276 (2004) at 5 (characterizing section 1-g(b) as an exception to the equal and uniform requirement), JC-0152 (1999) at 5 (same), JC-0141 (1999) at 3 (same).

[4]*See* Tex. S.J. Res. 8, 67th Leg., 1st C.S., 1981 Tex. Gen. Laws 295 ("SJR 8"); *see also* House Study Group, Special Legislative Report, Constitutional Amendment Analysis, Analysis of SJR 8, at 2 (Sept. 9, 1981); Tex. Legislative Council, Analysis of Proposed Constitutional Amendments Appearing on November 3, 1981, Ballot, Information Report No. 81-3 at 4 (Sept. 1981).

[5]House Study Group, Special Legislative Report, Constitutional Amendment Analysis, Analysis of SJR 8 at 1–2 (Sept. 9, 1981).

[6]Tex. Legislative Council, Analysis of Proposed Constitutional Amendments Appearing on November 3, 1981, Ballot, Information Report No. 81-3 at 4, 6 (Sept. 1981).

to the amendment, by the Legislature of its intent to provide only municipalities with a method to finance development with the use of tax increment revenues. *See Walker v. Baker*, 196 S.W.2d 324, 327 (Tex. 1946) (orig. proceeding) (stating that "contemporaneous construction of a constitutional provision by the Legislature, continued and followed, is a safe guide as to its proper interpretation").

Neither the circumstances surrounding the adoption of SJR 8 nor the enactment of its enabling legislation suggest that either the voters or the framers intended article VIII, section 1-g(b) to permit the Legislature to allow counties to use a tax increment funding mechanism for county projects. And despite the possibility that a given transportation project in a zone may have some county-wide benefit, it remains that all real property located within a county creating a zone is not taxed alike: 100% of the ad valorem taxes paid by property owners outside of the zone goes toward the general support of the county, and a percentage less than 100% of the ad valorem taxes paid by property owners inside the zone goes toward the general support of the county. *See generally* Tex. Att'y Gen. Op. No. MW-337 (1981) at 5. As this office concluded in Opinions GA-0981 and GA-1076, this taxation disparity is the infirmity under article VIII, section 1(a), which requires taxation to be equal and uniform—a mandate we cannot ignore.

For these reasons, a county's attempt to utilize a captured increment of ad valorem taxes to fund a county tax increment reinvestment zone is likely prohibited by article VIII, section 1(a). Accordingly, absent a constitutional amendment, it is likely a court would conclude that a county may not form and operate a CETRZ, a TIRZ, or a TRZ, to the extent that doing so utilizes a captured increment of ad valorem taxes to fund a county-created tax increment reinvestment zone.

## S U M M A R Y

Absent a constitutional amendment, it is likely a court would conclude that a county may not form and operate a county energy transportation reinvestment zone, a tax increment reinvestment zone, or a transportation reinvestment zone, to the extent that doing so utilizes a captured increment of ad valorem taxes to fund a county-created tax increment reinvestment zone.

Very truly yours,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

BRANTLEY STARR
Deputy Attorney General for Legal Counsel

VIRGINIA K. HOELSCHER
Chair, Opinion Committee

CHARLOTTE M. HARPER
Assistant Attorney General, Opinion Committee