# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00034-CV

**Titan Transportation, LP, Appellant**

**v.**

**Susan Combs, Comptroller of Public Accounts of the State of Texas; and Greg Abbott, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. D-1-GN-11-002866, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Titan Transportation, LP, appellant, sued Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas (collectively, the State), seeking a refund of franchise taxes that Titan paid under protest along with a refund or credit for an alleged overpayment of taxes. *See* Tex. Gov't Code §§ 403.201-.221 (governing protest suit after payment under protest); Tex. Tax Code §§ 112.001-.156 (governing taxpayer suits). Titan asserted that the State erroneously denied it a revenue exclusion it had claimed for payments made to its subcontractors during the relevant tax year.[1] In the alternative, Titan

---

[1] *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) (current version at Tax Code § 171.1011(g)(3)) (excluding certain "flow-through funds" from taxpayer's "total revenue" computation).

asserted it was entitled to deduct the subcontractor payments as a "cost of goods sold" (COGS).[2]

Following a bench trial, the trial court rendered judgment that Titan was not entitled to either the revenue exclusion or the COGS deduction for the relevant tax year. On appeal, Titan asserts that the trial court misinterpreted and misapplied the applicable tax provisions and that, as a matter of law, it qualifies for either the revenue exclusion or the COGS deduction. We will reverse the trial court's judgment, render judgment that Titan is entitled to exclude the subcontractor payments from its total revenue, and remand the case to the trial court for a determination of the amount of refund to which Titan is entitled.

## OVERVIEW OF THE FRANCHISE-TAX STATUTE

Under the current franchise-tax scheme, franchise taxes are assessed against a taxable entity's "taxable margin." Tax Code § 171.002(a), (b). This incarnation of the franchise-tax statute has been substantively amended several times since it was enacted in 2006. The Tax Code provisions applicable to this case are those in effect on January 1, 2008.[3] Under that version of the statute, the formula for determining taxable margin and calculating a taxpayer's franchise-tax obligation can be summarized as follows:

---

[2] *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 8 (amended 2013) (current version at Tex. Tax Code § 171.101(a)) (allowing taxpayer to elect to deduct COGS from total revenue); Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 13-16 *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, §§ 14, 15, 2007 Tex. Gen. Laws 4282, 4290-91 (amended 2013) (current version at Tax Code § 171.1012) (governing calculation of COGS deduction).

[3] Citations in this opinion will be to the current version of the Tax Code only when intervening amendments are not relevant to the disposition of the issues on appeal.

2

1. Calculate Total Revenue;

2. Subtract applicable deductions to determine Margin:

    (i) no deductions if Total Revenue is $10 million or less (qualifying taxpayer to use E-Z computation method); or

    (ii) deduct the greater of COGS, compensation, or a flat 30%;

3. Multiply Margin by the percentage of gross receipts from Texas business to determine Apportioned Margin (or Apportioned Total Revenue for E-Z computation filers);

4. Subtract any other allowable deductions to determine the taxable entity's Taxable Margin;

5. Multiply Taxable Margin by the applicable tax rate (.575% for E-Z computation filers, 0.5% for entities primarily engaged in wholesale or retail trade, or 1% for all others) to determine franchise-tax obligation; and

6. Subtract any allowable credits or discounts.

*See* Tax Code §§ 171.002 (general tax rates), .0021 (discounts for small businesses), .1011 (computation of total revenue), .1012 (determination of COGS deduction amount), .1013 (determination of compensation deduction amount), .1016 (E-Z computation method and rate for taxpayers with no more than $10 million in total revenue), .106 (how to calculate apportionment factor); Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 8 *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, § 11, 2007 Tex. Gen. Laws 4282, 4287 (amended 2013) (current version at Tax Code § 171.101) (determination of taxable margin). Under this version of the franchise-tax statute, there are four distinct methods for determining a taxpayer's taxable margin and three different tax rates that may be applied to determine the amount of franchise tax that is due. *See id.* § 171.1016; Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5,

2006 Tex. Gen. Laws 1, 8 *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, § 11, 2007 Tex. Gen. Laws 4282, 4287 (amended 2013). Effective January 1, 2014, taxpayers not using the E-Z computation method will also have the option to deduct a flat $1 million from total revenue if that sum is greater than the COGS, compensation, or 30% deductions. Tax Code § 171.101(a). Although the computation methods and tax rates may vary, the first step for all taxable entities and all methods of computing taxable margin is to calculate the taxpayer's "total revenue."

Section 171.1011 of the Tax Code provides the method for calculating a taxable entity's total revenue. In general, total revenue is income reported to the federal IRS less various categories of revenue that the statute specifies are to be excluded, excepted, deducted, or otherwise limited. *Id.* § 171.1011. For example, all taxpayers may deduct certain flow-through funds, while only taxable entities in select industries are permitted to exclude other types of flow-through funds. *Compare id.* § 171.1011(f)–(g) (flow-through-funds exclusions) *with id.* (g-1), (g-3), (g-4) (flow-through-funds exclusions for specific industries); *see also In re Nestle USA*, 387 S.W.3d 610, 615 (Tex. 2012) (discussing franchise-tax scheme). A manifest purpose of excluding "flow-through funds" is to except from taxation gross receipts that do not constitute actual gain or income to the taxpayer. *See, e.g.*, Tax Code § 171.1011(f), (g), (g-1), (g-3), (g-4).

After calculating total revenue, taxpayers may then employ the method of determining taxable margin that produces the lowest franchise-tax obligation. *Id.* §§ 171.101(a) ("The taxable margin of a taxable entity is computed by . . . determining the taxable entity's margin, which is the lesser of" the 30% cap method, COGS subtraction method, or compensation subtraction method or, effective January 1, 2014, flat $1 million subtraction from total revenue), .1016 (allowing qualifying

taxpayers to elect to pay lower franchise-tax rate under E-Z computation method in exchange for foregoing any deductions not specifically authorized by that section). The methods of calculating taxable margin are characterized by the mutually exclusive subtractions from total revenue that are authorized, the deadlines for electing which deductions to take, and the applicable tax rate. Under the E-Z computation method, taxpayers with $10 million or less in total revenue may elect to forego any deductions from total revenue in exchange for a 0.575% tax rate, which is significantly lower than the general tax rate of 1%. *See id.* §§ 171.002 (general tax rate), .1016 (taxpayers electing E-Z computation method "may not take a credit, deduction, or other adjustment" other than apportionment of gross receipts attributable to business in Texas and, effective January 1, 2014, discounts for small businesses). Taxpayers who do not qualify for the E-Z computation method—or who would obtain more favorable tax treatment under another method—may take (1) a 30% general deduction from total revenue, (2) a COGS deduction, (3) a deduction for qualifying compensation, or (4) effective January 1, 2014, a $1 million flat deduction. *See id.* § 171.101(a). Taxpayers electing to take a COGS or compensation deduction must "notify the comptroller of [that] election not later than the due date of the annual report." *Id.* § 171.101. In addition, any sums excluded from total revenue cannot be included as part of either a COGS or compensation deduction, and certain caps or limitations may apply to otherwise qualifying expenses. *Id.* §§ 171.1011(j) (sums excluded from total revenue may not be included in COGS or compensation calculations), .1012 (f) (cap on indirect and administrative overhead costs in COGS deduction), .1013(c) (compensation cap).

After applicable deductions have been taken, taxable margin is determined by apportioning the adjusted revenue between in-state and out-of-state business and, except for E-Z

5

computation filers, subtracting any other allowable deductions.  *Id.* §§ 171.101(a)(2), (3), .1016(b)(2), (c).  A taxpayer's franchise-tax obligation is determined by multiplying its taxable margin by the applicable tax rate and then subtracting any allowable credits or discounts.  *See id.* §§ 171.0021 (discounts for small businesses), .1016(d) (allowing E-Z comp filers to take small business deduction beginning January 1, 2014).  For taxpayers not using the E-Z computation method, the tax rate is 0.5% for entities primarily engaged in wholesale or retail trade and 1% for all others.  *Id.* §§ 171.002 (general tax rates), .101 (determination of taxable margin), .1016 (E-Z computation method and applicable tax rate); *see also In re Nestle*, 387 S.W.3d at 614-16 (providing overview of franchise-tax statute and generally discussing how it operates).  Taxable entities with a tax obligation that is less than $1,000 or with total revenue under a threshold amount (currently $1,000,000) are exempt from paying franchise taxes.  *Id.* § 171.002(d).

**TITAN'S FRANCHISE-TAX DISPUTE**

Titan is in the business of hauling, delivering, and depositing "aggregate" at real-property construction sites, where it is used as an ingredient in concrete or as a foundation for the construction of roads, buildings, and parking lots.[4]  Titan provides this service primarily through the use of subcontractors, to whom it is contractually obligated to share a portion of the gross receipts from the provision of those services.

The underlying tax protest concerns Titan's 2008 franchise-tax report.  Titan filed that report using the E-Z computation method after excluding from its total revenue certain

---

[4] Aggregate is a combination of rock or gravel and dirt, sand, or "fines" (dirt that comes off crushed rock).

6

"flow-through" payments to subcontractors, which reduced its gross revenue from $12.6 million to a little over $2 million. At that time, Titan apportioned 100% of its total revenue to Texas-based business. Based on Titan's apportioned total-revenue calculation and application of the lower E-Z computation tax rate, Titan reported a franchise-tax obligation of $11,524, which it timely paid in full.

In claiming a substantial revenue exclusion, Titan relied on former section 171.1011(g)(3) of the franchise-tax statute, which provided as follows:

> A taxable entity shall exclude from its total revenue, to the extent [reported to the federal IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:
>
> . . . .
>
> (3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) ("the (g)(3) revenue exclusion" or "former section 171.1011(g)(3)"). However, after conducting a "desk audit," the Comptroller determined that (1) Titan was a trucking company rather than a construction company and thus was not engaged in a type of business that qualifies to claim the (g)(3) revenue exclusion; (2) without the (g)(3) revenue exclusion, Titan did not qualify to use the E-Z computation method; and (3) Titan had not timely elected to use the COGS or compensation

7

methods.[5] Accordingly, the Comptroller defaulted Titan to a 30% flat deduction on $12.6 million of total revenue, applied a 1% tax rate to the entire sum, and recalculated Titan's franchise-tax obligation to produce a $77,290.81 deficiency for the relevant tax year, after having credited its prior payment.

Titan paid the assessed deficiency plus interest ($88,461) under protest, which resulted in its making a cumulative 2008 franchise-tax payment of nearly $99,985. *See* Tax Code § 112.051. Along with its protest payment, Titan submitted a letter to the Comptroller outlining its reasons for claiming the (g)(3) revenue exclusion and also claiming a COGS deduction in the alternative. In addition, Titan asserted, for the first time, that it had failed to claim an apportionment factor for its Texas-based business and requested that the Comptroller recalculate its franchise tax on that basis. Titan subsequently filed the underlying lawsuit, seeking a refund of amounts paid under protest and additional sums it claimed represented a tax overpayment resulting from the failure to apply the correct apportionment factor. *See id.* §§ 112.051-.060 (governing tax protest suits).

In addition to other claims not at issue on appeal,[6] Titan maintained that it was

---

[5] The "desk audit" consisted of the Comptroller's auditor reviewing Titan's 2008 franchise-tax report, information Titan posted on its website about its business activities, and Titan's responses to a questionnaire the auditor had sent to Titan with a letter stating that the review was "not an audit" but "[did] not preclude an audit on [the same] period in the future." The auditor did not call or speak to anyone at Titan or inspect its facilities, equipment, job sites, or business records, but primarily denied the exclusion on the basis of statements on Titan's website that describe it as "a major hauler of aggregates" that "provides truckload transportation of aggregates in North East Texas." Titan's website is silent regarding activities the Comptroller would consider to qualify as construction services.

[6] In addition to the claims on appeal, Titan had asserted an equal-protection challenge and sought a declaration that it is a "qualified courier and logistics company" for purposes of a total-revenue exclusion that became effective January 1, 2012. *See* Tex. Tax. Code § 171.1011(g-7) (revenue exclusion for qualified courier and logistics companies). The trial court granted summary

8

entitled to take the (g)(3) revenue exclusion based on the nature of its business activities and contracts with its subcontractors that required Titan to pay 84% of its gross receipts to independent contractors it had engaged to haul, deliver, and deposit aggregate at real-property construction sites. Titan asserted that aggregate hauling and delivery was essential to construction work on real property and that depositing those materials onsite by its subcontractors effected a change in the topography of real property. Based on these circumstances, Titan claimed that the payments to its subcontractors satisfied the statutory prerequisites for claiming the (g)(3) revenue exclusion because (1) the payments were mandated by contract, (2) to be paid to someone other than Titan (the taxable entity), and (3) the funds paid to the subcontractors were for the provision of "services, labor, or materials in connection with the actual or proposed . . . construction, remodeling, or repair of improvements on real property." *See id.* § 171.1011(g)(3).

In the alternative, Titan asserted that the subcontractor payments could be properly deducted as a "cost of goods sold" under section 171.1012 of the franchise-tax statute and that it should be allowed to amend its tax report to claim the deduction. *See id.* § 171.1012(i). Although it is undisputed that Titan never takes legal ownership of the aggregate it supplies to construction sites and does not sell anything that meets the statutory definition of "goods,"[7] Titan asserted that

---

judgment in the State's favor on Titan's constitutional and declaratory-judgment claims, and Titan has not appealed the trial court's disposition of those claims.

[7] The term "goods" is defined as "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tax Code § 171.1012(a)(1). "Tangible personal property," however, "does not include: (i) intangible property; or (ii) services." *Id.* § 171.1012(a)(3)(B). The Comptroller characterizes Titan as a service provider that cannot claim a COGS deduction.

9

it qualified to take a COGS deduction based on the following language in section 171.1012(i) of the Tax Code:

> A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair or industrial maintenance . . . of real property is considered to be an owner of that labor or materials *and may include the costs*, as allowed by this section, in the computation of cost of goods sold.

*Id.* (emphasis added). Titan maintained that its subcontractor payments were deductible under this provision as costs of labor and materials furnished to projects for the construction and improvement of real property. Titan further asserted that under the plain language of section 171.1012(i), it was deemed to be the owner of the labor and materials it furnished and was not required to acquire or produce any goods in order to take a COGS deduction. Titan contended that if the subcontractor payments were deductible as COGS, it would be entitled to include additional indirect and administrative overhead expenses as part of the deduction, subject only to a 4% statutory cap. *See id.* § 171.1012(f).

Titan also sought recalculation of its tax obligation because it had applied an incorrect apportionment factor in determining its taxable margin. Although Titan had originally applied a 100% apportionment factor, it claimed in its lawsuit that only 20.18% of its total revenue was actually generated from business in Texas. *See id.* §§ 171.101(a)(2) (requiring apportionment of taxable entity's margin to this state to determine apportioned margin), .1016(b)(2) (requiring apportionment of taxable entity's total revenue to this state to determine apportioned total revenue). Applying the lower apportionment factor to its total revenue, as reduced by either the (g)(3) revenue exclusion or a COGS deduction, Titan asserted that its franchise-tax obligation for the relevant tax

year should have been significantly less than its original $11,524 tax payment. Accordingly, Titan sought a refund of the difference between what it actually owed (which it claims on appeal is around $2,500) and the $99,985 it had already paid, plus interest.

While the case was pending, the Comptroller ultimately agreed that Titan was entitled to apply a 20.18% apportionment factor and issued an amended tax assessment solely on that basis. The Comptroller also determined that taxpayers are not precluded from taking a COGS or compensation deduction if they need to recalculate returns based on the denial of a previously claimed exclusion or deduction.

However, the Comptroller continued to maintain that Titan was not eligible for either the (g)(3) revenue exclusion or the COGS deduction because she interpreted the relevant statutory provisions to require, among other things, that the taxpayer be a "construction company" that provides services, labor, or materials that effect a physical change to the property. The Comptroller asserted that Titan considered itself to be, and was in fact, a "transportation company," not a construction company. Furthermore, the Comptroller did not agree that Titan's subcontractors provided any service, labor, or materials that effected a physical change on real property. Instead, she likened Titan to a mere courier who would drop mail off at the front desk of a construction site or a delivery service who might deposit bricks in a pile on or near the site. Based on these conclusions, the Comptroller recalculated Titan's total franchise-tax obligation applying both a 30% flat deduction and a 20.18% apportionment factor and determined that Titan's total franchise-tax obligation for the 2008 report year was actually $17,922.75. The Comptroller issued

11

an amended tax statement to that effect but only credited Titan with its original payment of $11,524, leaving a deficiency of $6,399.12.[8]

At trial, the evidence concerning Titan's business operations was essentially uncontroverted. Moreover, the State conceded that Titan was entitled to a 20.18% apportionment factor, but only if the trial court agreed that Titan could neither exclude the subcontractor payments from total revenue nor include those sums as part of a COGS deduction. The principal areas of conflict concerned the correct interpretation of the applicable statutory provisions and the proper characterization of Titan's business activities given the undisputed evidence.

While there was no dispute that Titan provides trucking and hauling services (and is a licensed motor carrier), the parties disputed whether Titan provides any "construction" services, labor, or materials, which the State asserted is essential to qualify for either the (g)(3) exclusion or the COGS deduction. The State argued that Titan provides only trucking and hauling services and merely delivers construction materials to real-property construction sites. Titan, on the other hand, argued that it also "installs" construction materials as part of its service, but it principally maintained that it is not required to do any construction work to benefit from the relevant tax provisions. Other disputed issues included whether the (g)(3) revenue exclusion requires a contract between Titan and

_____

[8] Neither the amended tax statement nor the State's appellate brief addresses the disposition of Titan's protest payment of $88,461, which was not applied as a credit on the amended tax statement even though the Comptroller had determined that Titan's franchise-tax obligation, though disputed, was significantly lower than the amount Titan actually paid for the 2008 tax year.

its *customers* that mandates Titan's use of and payment to subcontractors. According to the State,

Titan's subcontractor contracts are insufficient to meet the statutory requirements.[9]

As established at trial, aggregate is a material that is integral to the construction of

roads, parking lots, and building foundations and is also used as a component in concrete. Titan's

business involves hauling, delivering, and depositing aggregate at real-property construction sites.

Titan provides this service primarily through the use of subcontractors, with whom it executes

written contracts typically requiring that the subcontractors provide their own specialized trucks and

---

[9] Effective January 1, 2014, section 171.1011(g)(3) was amended to require the exclusion of "flow-through funds that are mandated by contract *or subcontract* to be distributed to other entities" and that are "subcontracting payments made under a contract *or subcontract* entered into by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property." Tex. Tax. Code § 171.1011(g)(3) (emphases added). The bill analysis for this enactment indicates that the amendment was proposed in response to the Comptroller's interpretation of section 171.1011(g)(3) as "allowing an entity to exclude subcontracting payments only when the entity has a contract in place that states that a specific portion of the work will be subcontracted" because the Comptroller's interpretation was inconsonant with the practices of the affected industry. Senate Research Ctr., Bill Analysis, Tex. H.B. 2766, 83d Leg., R.S. 2013. The proposed amendment was said to be necessary to clarify that the (g)(3) revenue exclusion applies even in the absence of a prime contract explicitly requiring a contractor to use subcontractors. *Id.*

In addition to the broad exclusion in subsection (g)(3), the Legislature also added a specific total-revenue exclusion applicable to taxable entities "primarily engaged in the business of transporting aggregates," which allows such entities to exclude from their total revenue "subcontracting payments made by the taxable entity to independent contractors for the performance of delivery services on behalf of the taxable entity." *Id.* (g-8). The bill analysis states that the amendment was proposed in response to the Comptroller's refusal to allow aggregate transporters to exclude payments to subcontractors that are mandated by a fee-splitting agreement, similar to the ones Titan uses with its subcontractors. *See* House Ways & Means Comm., Bill Analysis, Tex. H.B. 1733, 83d Leg., R.S. 2013. The bill analysis states that the proposed clarification was required because the Comptroller's actions in cases similar to Titan's resulted in aggregate transporters paying franchise taxes "based on an artificially inflated revenue amount." *See id.*; *see also* House Research Org., Bill Analysis, Tex. H.B. 500, 83d Leg., R.S. 2013 (noting that total revenue exclusion for aggregate transporters was authored by Rep. Hildebrand as part of HB 1733).

equipment and that Titan pay the subcontractors 84% of the gross receipts Titan's customers pay for the services provided. The contracts also permit Titan to deduct from the 84% fee any amounts the subcontractors owe to Titan, such as fuel expenses. The standard contract obligates Titan's subcontractors to provide "a complete transportation service" including "loading and unloading" and "delivery of commodities from origin to destination in accordance with customer delivery instruction." While the truck drivers are required to have commercial driver's licenses and licensed trucks, they are not contractually required to have any construction or installation licenses or permits. The contracts neither mention installation or deposition of the materials onsite nor require that the truck drivers receive specialized training to install or deposit the aggregate materials.

Titan does not have written contracts with its customers; thus, the only contractual arrangements concerning subcontractor payments are in Titan's written agreements with its subcontractors. Although Titan's customers may generally be aware of the subcontracting arrangement, they are not parties to those contracts. In some instances, however, a construction contractor may require "pre-approval" of Titan's subcontractors before onsite work is performed.

When a subcontractor completes a job for Titan, a "delivery ticket" is issued to the customer. The delivery ticket includes information identifying the subcontractor who performed the services. Titan in turn issues its customer an invoice using the same subcontractor-identification system so that (1) the invoice can be matched to the delivery ticket and (2) Titan can calculate the amount owed to the particular contractor who provided the service on Titan's behalf, in accordance with the parties' fee-splitting agreement. The record reflects that Titan's customers are billed by the ton and that the length of time to complete the hauling, delivery, and deposition of the construction

14

materials also affects the fee charged. The State maintains that this evidence establishes that Titan is only being paid for transportation services and not construction work.

Titan uses an accrual method of accounting, which means that Titan records its income the moment the payment obligation accrues rather than when payment is collected. Under this method, when the customer invoice is generated, the receipts are booked as revenue and the subcontractor is simultaneously credited with the full contractually mandated percentage. This accounting process typically results in the subcontractor receiving the contractually mandated payment (less any reimbursable expenses) from Titan before Titan has received any payment from its customer. Although Titan does not maintain separate accounts to segregate funds payable to each subcontractor individually, Titan creates weekly "settlement statements" showing the revenue the subcontractor generated on the top and the expenses owed to Titan on the bottom. On occasion, a subcontractor may actually owe Titan money for a particular week, due to fuel or other expenses owed to Titan. Based on the above-described payment process, the State contends that no customer payments actually "flow through" Titan because those payments are not handed directly from the customers to Titan and then to the specific subcontractors who performed the services.

Although Titan always provides aggregate to construction sites, the construction companies are not necessarily Titan's customers. For any given transaction, Titan's customer may be a quarry (which is not engaged in any construction activities) or a construction company developing or improving real property. In every case, the aggregate is owned by someone other than Titan; neither Titan nor its subcontractors ever takes ownership of the aggregate that is provided to construction sites. The State contends that this circumstance is fatal to Titan's COGS-deduction

15

claim and any claimed deduction that requires that the taxpayer has "provided" or "furnished" materials to a construction project.

Upon arriving at a construction site, Titan's subcontractors use specialized trucks to deposit the aggregate where directed by the general contractor or site foreman. Sometimes, the aggregate is deposited in a specified area so that it can be made into concrete. In most cases, the material is deposited by Titan's subcontractors in its final resting place at the construction site through the use of end-dump or belly-dump trailers that are driven slowly across a designated area to distribute the full load of aggregate. The aggregate is not "affixed" to the ground when Titan's subcontractor leaves. In addition, the aggregate frequently has to be leveled or "topped off" by the construction company after it is deposited by Titan's drivers; Titan never grades the aggregate after it is unloaded. Furthermore, Titan neither obtains a construction permit to perform its work nor is required to have a construction permit to complete its work, but often, a general contractor has a permit that covers the whole job. The State contends that this evidence establishes that Titan does not provide any construction services or labor.

The undisputed evidence shows, however, that the service Titan provides in picking up, transporting, and depositing the aggregate is more efficient for the construction companies and saves them from having to use additional labor to put the aggregate to a useful purpose. Lynrell Wesley, one of Titan's customers, testified that "[Titan] would bring a trailer [of] rock, however many a day I want, and space them out on a pad to save me labor." He further observed, "Well, if you've got drivers that will put material where you need it as opposed to just piling it up somewhere and leaving, it saves me time and money and labor," and stated that "[Titan] help[s]

16

installation . . . because they're putting [the aggregate] where I need it." He said he would "probably not" use Titan solely for transportation of the material.

After taking the case under advisement, the trial court concluded that Titan was not entitled to a revenue exclusion under former section 171.1011(g)(3) of the Tax Code or a COGS deduction under section 171.1012(i). The court agreed, however, that Titan was entitled to an apportionment factor of 20.18%. At Titan's request, the trial court issued findings of fact and conclusions of law in support of the final judgment. This appeal followed. The State does not challenge the 20.18% apportionment factor on appeal.

## DISCUSSION

The decisive issues in this case concern the appropriate interpretation of provisions of the franchise-tax statute as applied to undisputed evidence about the nature of Titan's business. In issue one, Titan argues that the trial court applied an incorrect interpretation of the (g)(3) revenue exclusion because the evidence conclusively establishes that (1) Titan was contractually obligated to pay 84% of its revenue to independent-operator subcontractors who provided the services for which Titan received payment and (2) the subcontractors provided "services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property." *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013). Titan further challenges the trial court's contrary conclusions of law 2 and 5 as being incorrect as a matter of law and fact findings 4, 5, 6, 9, 13, and 14 as immaterial or

17

unsupported by factually or legally sufficient evidence.[10]  In the alternative, Titan contends in its

---

[10] On appeal, Titan challenges all of the following fact findings (FOF) and conclusions of law (COL):

FOF 4: "Titan Transportation's customers paid Titan Transportation for transportation services.  Specifically, Titan Transportation's customers paid Titan Transportation to deliver aggregate, a building material."

FOF 5: "Titan Transportation's gross receipts were from purchases of . . . transportation services."

FOF 6: "Titan Transportation's customers did not pay Titan Transportation for construction services, construction labor, or construction materials.  Titan Transportation's customers did not pay Titan Transportation to install aggregate it transported."

FOF 7: "Titan Transportation did not own any of the aggregate it transported."

FOF 8: "Titan Transportation did not acquire or produce any goods sold in the ordinary course of business."

FOF 9: "Titan Transportation did not provide labor or materials to a construction project."

FOF 13: "Payments from Titan Transportation's customers did not flow through Titan Transportation to [its] subcontractors."

FOF 14: "Payments from Titan Transportation's customers were not payments handled by Titan Transportation to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property."

COL 2: "Titan Transportation may not exclude its $10,683,668 in payments to its subcontractors from gross revenue under Section 171.1011(g)(3)."

COL 3: "Titan Transportation is not entitled to a take a cost of goods sold deduction under Section 171.1012(i)."

COL 5: "Titan Transportation's Franchise tax is correctly calculated in Column E of [the Comptroller's amended tax statement].  Titan Transportation's correct tax due was $17,922.75."

18

second issue that it is entitled to the COGS deduction as a matter of law and challenges the trial court's fact findings 4 through 9 and conclusions of law 3 and 5. Because our disposition of Titan's first issue is case dispositive, we do not reach Titan's second issue. *See* Tex. R. App. P. 47.1.

### *Standard of Review*

The dominant issue in this case concerns a matter of statutory construction, which we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in construing statutes is to give effect to the legislature's intent and, ordinarily, "'the truest manifestation' of what lawmakers intended is what they enacted." *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). The language emerging from the legislative process "constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, 'the judge's inquiry is at an end.'" *Combs v. Roark Amusement & Vending, L.P.*, ____ S.W.3d ____, No. 11-0261, 2013 WL 855737, at *2 (Tex. 2013) (quoting *Johnson*, 209 S.W.3d at 651-52). We give an unambiguous statute its plain meaning without resorting to rules of construction or extrinsic aids. *Id.*; *see also Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635, 637 (Tex. 2010) (branding such reliance "improper," because "[w]hen a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language"); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008). Accordingly, rules of construction such as agency deference and strict construction generally come into play only when a statute is ambiguous. *See, e.g.*, *Roark Amusement*, 2013 WL 855737, at *2 (courts defer to agency interpretation of ambiguous statute unless plainly erroneous or inconsistent with statutory language);

19

*Texas Unemployment Comp. Comm'n v. Bass*, 151 S.W.2d 567, 570 (Tex. 1941) (explaining when ambiguous tax statutes must be strictly construed in favor of or against parties).

Secondary issues in this case involve the trial court's findings of fact and conclusions of law. We do not defer to the trial court on questions of law. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008). We do defer to a trial court's fact-findings if they are supported by legally and factually sufficient evidence. *Id.* For mixed questions of law and fact, we similarly defer to the trial court's factual determinations if supported by the evidence but review its legal determinations de novo. *Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999).

***Construction and Applicability of the (g)(3) Revenue Exclusion***

The principal issue in this case concerns the proper construction and application of former section 171.1011(g)(3) of the Tax Code, which provided:

> A taxable entity shall exclude from its total revenue, to the extent [reported to the federal IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:
>
> . . . .
>
> (3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013). The State construes this provision to impose a number of requirements that it contends neither Titan nor its subcontractors have satisfied. Those requirements, summarily stated, are that the taxable

20

entity (1) must provide "design, construction, remodeling, or repair" services, labor, or materials; (2) must have a written contract with its customers that prescribes the fee-splitting arrangement between the taxable entity and its subcontractors; and (3) can only meet the "flow-through" requirement if third-party payments are segregated and paid in a manner that guarantees that a subcontractor only receives the actual dollars that the customer paid to the taxable entity for the subcontractor's work. The fundamental flaw in the State's analysis is that the limitations it advances are extra-textual and alter the statute's plain meaning. *See Roark Amusement*, 2013 WL 855737, at *2 (Comptroller's "arguments that are incompatible with the statutory text" are "unpersuasive"). The limitations are likewise not found in the related administrative rule, which merely echoes the statutory language. *See* 34 Tex. Admin. Code § 3.587(e)(2)(C) (2013) (Comptroller of Pub. Accounts, Margin: Total Revenue).

As a threshold matter, the State asserts that Titan cannot claim the (g)(3) revenue exclusion because it is not a construction company. According to the State, "[t]he issue that drives every other issue in this case is whether [Titan] is only a transportation company, whether it is instead a construction company, or whether it is a transportation company that is *also* a construction company (and if so, to what extent)." As the State reads the (g)(3) revenue exclusion, "transportation costs are not deductible, but construction costs are." In arriving at this conclusion, the State contends the phrase "services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property" can only be read as applying the terms "design, construction, remodeling, or repair" as individual modifiers to the terms "services, labor, and materials." And

21

when so read, the State argues, it is clear that only taxable entities that are design, construction, remodeling, or repair companies can claim the exclusion when they are subcontracting for services, labor, or materials.

In restructuring the language in former subsection (g)(3) to support its conclusion, however, the State ignores the statute's "in connection with" language. "In connection with" is a phrase of intentional breadth. Indeed, depending on the context in which it is used, the scope of the phrase "in connection with" can sometimes be so broad as to be ambiguous. *Compare Maracich v. Spears*, 133 S. Ct. 2191, 2200-05 (2013) (acknowledging that phrase "in connection with" is susceptible to broad interpretation and is essentially "indeterminat[e] because connections, like relations, stop nowhere" but concluding that statutory provision at issue was not ambiguous in context of statute as whole (alteration in original) (internal quote marks omitted)), *United States v. National Training & Info. Ctr., Inc.,* 532 F. Supp. 2d 946, 957-58 (N.D. Ill. 2007) (noting that term "in connection with" is commonly used in statutes and holding that phrase was not unconstitutionally vague in context in which it was used), *and Ex parte Ellis*, 309 S.W.3d 71, 88-89 (Tex. Crim. App. 2010) (although phrase "in connection with" was found to be unconstitutionally vague as to one Election Code provision, phrase was not impermissibly broad when used in another Election Code provision) *with Comptroller of Treasury v. Clyde's of Chevy Chase, Inc.*, 833 A.2d 1014, 1023 (Md. 2003) (concluding that phrase "in connection with entertainment" in admissions and amusement-tax statute was not clear and unambiguous because statute provided no guidance as to level of nexus necessary to satisfy "connection" requirement). With regard to the (g)(3) revenue exclusion at issue in the present case, we conclude that the phrase "in connection

with" is broad enough to encompass the services Titan provides to construction sites but, as limited by its context, is not so broad as to be ambiguous or lead to absurd results. The limitations that the State reads into the (g)(3) revenue exclusion, however, would contravene the breadth inherent in the language the legislature adopted, and we cannot ignore that language unless applying its plain meaning would lead to absurd results.

As used in former section 171.1011(g)(3), the phrase "in connection with" can only be read as requiring some reasonable nexus between the services, labor, and materials for which the taxpayer pays a subcontractor and "the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of boundaries of real property." It would be inconsistent with the purpose of the franchise-tax statute as a whole to read the phrase as applying whenever *any* connection—however remote or attenuated—exists between services, labor, and materials and actual or proposed construction, remodeling, design, or repair work for real property. Because the (g)(3) revenue exclusion removes certain gross receipts from the franchise-tax base, the legislature must have intended the phrase "in connection with" to have a logical limit.

The State suggests that the only reasonable limit is to impose a requirement that the taxpayer's subcontractor be engaged in activities that effect a material or physical change in the property itself. This cannot be a proper construction of the statute, however, because it expressly applies to "proposed" design, construction, remodeling, or repair work on real property and also includes work pertaining to "the location of boundaries of real property," neither of which would involve an actual change to the physical character of real property. Given its context, the only plausible interpretation of the "in connection with" language employed in the (g)(3) revenue

23

exclusion is that there must be a reasonable—i.e., more than tangential or incidental—relationship between the activities delineated in the statute and the services, labor, or materials for which the subcontractors receive payment. Given the breadth of the statute's language, there is no textual support for the State's position that the statute is limited to construction companies and excludes transportation companies. The critical inquiry, as it pertains to the dispute in this case, is whether the services, labor, or materials provided have a reasonable connection to construction, remodeling, design, or repair work on real property.

In the present case, the required nexus is established by evidence that Titan provided services that were logically and reasonably connected with the construction of improvements on real property and, indeed, were directly related to the construction of such improvements. The undisputed testimony at trial was that the use of aggregate is indispensable to the types of construction projects for which Titan claimed the exclusion; the service of picking up and transporting the aggregate to the construction sites was necessary and integral to the construction of improvements on real property; and in most cases, the aggregate Titan hauled to the construction sites had to be placed in a particular location on the site to be useful, and Titan's subcontractors deposited the material in a manner that saved the construction companies time, labor, and money. The general contractors at the construction sites could have used their own laborers to complete these indispensable tasks, and the fact that Titan was paid to undertake this work is the very definition of a "service." *See* Webster's Third New Int'l Dictionary 2075 (2002) (defining "service" as "the performance of work commanded or paid for by another"). Accordingly, we conclude that, as a matter of law, Titan paid its subcontractors "to provide services . . . in connection with the actual or

24

proposed design, construction, remodeling, or repair of improvements on real property." Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013). It is immaterial whether the subcontractors' activities could also be properly characterized as providing labor or materials, as Titan maintains, because the provision of services is sufficient under the statute's plain language.

The State contends that Titan's operations are functionally similar to traditional courier services that might be provided by an entity like FedEx. Based on this analogy, the State contends that an interpretation of former section 171.1011(g)(3) that would permit Titan to exclude its subcontractor payments from total revenue would lead to the "absurd result" that any courier service making deliveries to a construction site could qualify for the (g)(3) revenue exclusion. To some extent, the State's proffered analogy embodies a logical fallacy. There are a number of statutory requirements that must be satisfied before a taxpayer is entitled to claim the (g)(3) revenue exclusion; however, the State's analogy focuses only on discrete aspects of the statute and Titan's services to extrapolate to an "absurd result." Assuming the courier services could meet the other requirements to qualify for the exclusion in the first place, it is unlikely that such taxpayers would be able to establish anything other than the most tangential relationship between the courier services provided and the activities listed in former section 171.1011(g)(3). It seems to us highly unlikely that a courier like FedEx would either know or care what is in packages it would be called on to deliver to a construction site, and it would therefore be unable to establish a nexus between the delivery service and the actual or proposed design or construction of improvements on real property (or any of the other qualifying activities).

25

We are also not persuaded that absurd consequences necessarily ensue from the plain language of the statute based on the mere possibility that a courier service could theoretically qualify for the exclusion to the extent of any deliveries to construction sites. A manifest purpose of former section 171.1011(g)(3) has always been to avoid double taxation. Given such a purpose, we fail to see how it would necessarily be "absurd" in all circumstances to allow a courier service utilizing subcontractors to exclude subcontractor payments from the courier's total revenue if such payments do not truly represent gain or income to the courier service. Even if the subcontractor payments might arguably resemble ordinary business expenses for compensation, the franchise-tax statute allows taxpayers to deduct qualifying compensation costs to reduce their franchise-tax obligation. Unlike compensation for employees or labor costs paid by sellers of goods, however, businesses that typically employ independent-contractor arrangements would largely be denied parallel treatment of payments that are the functional equivalent of compensation absent Tax Code provisions like the (g)(3) revenue exclusion. Those provisions in the franchise-tax statute that permit the exclusion or deduction of non-employee compensatory payments allow for a measure of parity where it might logically be warranted. *See, e.g., id.* §§ 171.1011(g)(1) (sales commissions to nonemployees, including split-fee real estate commissions), (g)(3) (subcontractor payments for services, labor, or materials in connection with construction industry), (g-5) (payment made by live-event promotion company to artist for performance), (g-6) (payments for destination management services), (g-7) (subcontractor payments by qualified courier and logistics companies), (g-8) (subcontractor payments by aggregate transporters), (g-10) (subcontracting payments by barite transporters), (g-11)

26

(subcontractor payments by landman service providers).[11] To the extent the State's concerns may be theoretically justified, courts are not at liberty to rewrite statutes to reach a more desirable result in the name of statutory construction. *See, e.g.*, *Stockton v. Offenbach*, 336 S.W.3d 610, 619 (Tex. 2011).

In any event, we need not consider whether the types of services FedEx might provide to a construction site would be too remote or attenuated to qualify for the exclusion provided in former section 171.1011(g)(3). It is sufficient that the record in the present case establishes that the services Titan provides have a reasonable nexus with the actual construction of improvements on real property, which satisfies the statutory requirement that services qualifying for the exclusion be rendered "in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of boundaries of real property."

The State next argues that the evidence establishes that Titan does not qualify for the (g)(3) revenue exclusion for three additional reasons, all of which the State contends show that there were not any payments that actually "flowed through" Titan to its subcontractors. First, the State construes the statutory language "mandated by contract to be distributed to other entities" as requiring that the taxable entity have a contract with its customers that requires the taxpayer to subcontract out a specified portion of the work for which it is to receive payment. According to

---

[11] We note parenthetically that, effective January 1, 2012, the Legislature amended section 171.1011 to provide that "[a] taxable entity that is a qualified courier and logistics company shall exclude from its total revenue [reported to the federal IRS as income], subcontracting payments made by the taxable entity to nonemployee agents for the performance of delivery services on behalf of the taxable entity." Tax. Code § 171.1011(g-7). Although not strictly relevant to the statutory-construction issue presented in this case, this provision illustrates that it is not necessarily "absurd" to apply the plain language of former section 171.1011(g)(3) to allow traditional courier services to exclude qualifying flow-through payments to subcontractors.

the State, in light of the provision's reference to "other entities," an "other" can exist only in a three-party situation (i.e., a transaction involving an additional entity other than the contracting parties); as a result, the State argues that a taxpayer's subcontract is insufficient standing alone. It is undisputed that Titan has written contracts only with its subcontractors and that there are no customer contracts requiring Titan to engage or pay subcontractors.

As used in the (g)(3) revenue exclusion, we read the term "other" to mean someone other than the taxable entity. Although a tripartite contractual relationship could give rise to a qualifying payment obligation, such an arrangement is not required under a plain reading of the statute. As previously stated, an evident purpose of the (g)(3) revenue exclusion is to prevent double taxation of funds that are not truly gain or income to the taxpayer, and this purpose is satisfied regardless of whether the mandate is contained in a contract with a customer or with a subcontractor. Before any work has been completed, Titan executes contracts with its independent-contractor truck drivers that require Titan to pass on a fixed percentage of the gross receipts for services provided; these contracts thus satisfy the statutory requirement that qualifying payments be contractually mandated to someone other than the taxpayer. Imposing the more stringent requirement the State suggests would result in judicial rewriting of the statute.

Second, the State argues that the revenue exclusion in former section 171.1011(g)(3) must require a tripartite relationship because any other reading would conflict with section 171.1011(i), which states: "*Except as provided by [section 171.1011(g)]*, a payment made under an ordinary contract for the provision of services in the regular course of business may not be excluded." *Id.* § 171.1011(i) (emphasis added). According to the State, Titan's contracts with its

28

subcontractors are merely ordinary contracts for the provision of services in the regular course of business, and thus, allowing Titan to deduct payments to subcontractors under those contracts would be contrary to the limitation in subsection (i). We do not fully understand this argument. Subsection (i) explicitly excepts from its scope payments that are made under "ordinary contract[s] for the provision of services in the regular course of business" *as long as they meet the requirements for excluding flow-through funds in subsection (g)*. Rather than illustrating that such contracts could not reasonably be encompassed within the scope of the (g)(3) revenue exclusion, subsection (i) does the opposite.

Finally, the State asserts that funds can only be considered to "flow through" the taxable entity if the taxpayer receives the payment first and then pays the subcontractor only when the taxpayer has the money in hand. The State further argues that deduction of any reimbursable expenses from a contractually mandated payment negates its character as "flow-through funds." Titan aptly refers to this as a "segregate, wait, and trace" requirement. Once again, the State seeks to impose overly formalistic requirements neither found in the statute's plain language nor supported by the related administrative rule. The undisputed evidence at trial established that Titan employed sufficient procedures to ensure that its subcontractors were paid from gross receipts attributable to the work the subcontractors performed. The evidence showed that Titan and its subcontractors entered into their engagement contracts before any services were performed. Upon making a delivery, each subcontractor would provide a "delivery ticket" that included identifying information about the subcontractor. Customer invoices were generated based on the "delivery ticket" and similarly identified the subcontractor that performed the work. Receivables and payables were

tracked using these identification numbers. In accordance with the accrual method of accounting, Titan booked the receivable when the invoice was generated and booked the 84% subcontractor payment obligation at the same time. Titan generated "weekly statements" showing the contract payment separately from the reimbursable expenses. For tax report year 2008, the evidence showed that Titan earned and retained only 16% of its gross customer receipts and that the remainder of the funds effectively passed through Titan to the subcontractors who performed the work. There is nothing in the (g)(3) revenue exclusion that requires flow-through funds to be segregated and subcontractors to be paid only the actual dollars Titan received for their work. We also do not agree with the State that use of the accrual method of accounting is expressly or implicitly prohibited or that the deduction of reimbursable expenses negates the "flow-through" nature of the funds. It would ignore the economic realities of Titan's business and could result in double taxation if Titan were required to pay franchise taxes on payments made to its subcontractors pursuant to their fee-splitting agreement. *See Roark Amusement*, 2013 WL 855737, at *3 & n.14 ("We believe that in the area of tax law, like other areas of economic regulation, a plain-meaning determination [of the statute] should not disregard the economic realities underlying the transactions in issue.").

Applying a proper construction of the statute, it becomes clear that the challenged portions of the trial court's findings of fact 4, 5, 6, and 9 are immaterial and that findings of fact 13 and 14 and conclusions of law 2 and 5 are erroneous as a matter of law. Accordingly, Titan is entitled to claim the (g)(3) revenue exclusion for those subcontractor payments it made in accordance with its contractual agreements to pay its subcontractors 84% of the gross receipts it

30

received for subcontractor services to haul, deliver, and deposit aggregate at real-property construction sites.

## CONCLUSION

The evidence admitted at trial conclusively establishes that a portion of Titan's gross revenue qualifies for the total-revenue exclusion in former section 171.1011(g)(3) of the franchise-tax statute. Because the trial court concluded otherwise, we reverse the portion of the trial court's judgment denying Titan the (g)(3) revenue exclusion and render judgment that Titan is entitled to claim that exclusion for the relevant tax year. We remand the cause to the trial court for further proceedings to determine the exact amount of refund to which Titan is entitled.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Field

Reversed, Rendered, and Remanded in Part

Filed: March 14, 2014