# IN THE SUPREME COURT OF TEXAS

No. 17-0464

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS;
AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, PETITIONERS,

V.

AMERICAN MULTI-CINEMA, INC., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued October 9, 2019**

JUSTICE BUSBY delivered the opinion of the Court.

The issue in this franchise tax case is whether a movie theater may subtract film exhibition costs as cost of goods sold when calculating its taxable margin. *See* TEX. TAX CODE § 171.1012. As relevant here, a taxable entity may subtract its costs when: (1) the costs relate to "goods," which are (a) real or tangible personal property (b) "sold" in the ordinary course of the taxable entity's business; and (2) the taxable entity "owns" the goods. *Id.*

Following a bench trial, the trial court concluded that Tax Code section 171.1012 permitted the movie theater to subtract exhibition costs as cost of goods sold because the theater "produces goods for sale in [the] ordinary course of business" by exhibiting films to paying customers. The court of appeals affirmed, holding that film exhibitions qualify as tangible personal property under

the "film" prong of the statutory definition. 580 S.W.3d 663, 671 (Tex. App.—Austin 2017). Neither court separately addressed the requirements that tangible personal property be owned and sold, though the parties argued those issues. Because we conclude film exhibitions are not tangible personal property that is sold, we hold the theater was not entitled to include exhibition-related costs in its cost of goods sold. We therefore reverse and render judgment in the Comptroller's favor.

## BACKGROUND

Since 1893, Texas has imposed a franchise tax on most domestic and foreign corporations operating in this State. *In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012). These taxes "tax . . . the value of th[e] privilege" to transact business in Texas, which "confers economic benefits, including the opportunity to realize gross income and the right to invoke the protection of local law." *Id.* at 622 (quoting *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 270 (Tex. 1979)).

Determining a taxable entity's franchise tax liability starts with the entity's "'total revenue,' a figure derived by adding together select amounts reportable as gross income on a federal tax return, subtracting bad debts and other items included on the federal return, and excluding receipts associated with various transactions." *Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 93 (Tex. 2017) (citing TAX CODE §§ 171.101(a), .1011). In tax years 2008 and 2009, a taxable entity could subtract from total revenue the greatest of: (1) cost of goods sold (COGS); (2) compensation and benefits paid to officers, directors, owners, partners, and employees, subject

2

to a cap;[1] or (3) thirty percent of total revenue.[2] Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 4, sec. 171.101, 2006 Tex. Gen. Laws 1, 8 (codified at TAX CODE § 171.101(a)). In practice, the costs a taxable entity chooses to subtract from total revenue depend on its business: sellers of goods typically subtract COGS, while service providers generally elect to subtract either thirty percent of revenues or compensation paid. *See* TAX CODE § 171.1012; Cynthia M. Ohlenforst, *The New Texas Margin Tax: More Than a Marginal Change to Texas Taxation*, 60 TAX LAW. 959, 971 (2007).

This case involves a disagreement between American Multi-Cinema (AMC)—a movie theater chain—and the Texas Comptroller regarding AMC's election to use COGS in calculating its franchise tax liability for 2008 and 2009. AMC's calculation included costs it incurred in exhibiting films, including film acquisition costs and costs associated with the theater auditoriums themselves. AMC subtracted COGS totaling $1,657,313,911 in 2008 and $1,670,197,268 in 2009.

Following an audit, the Comptroller disallowed AMC's subtraction of exhibition costs and requested additional franchise taxes totaling $750,743.46 for 2008 and $699,405.07 for 2009. AMC paid under protest and sued to recover the disputed amount, arguing its exhibition costs were properly subtracted as COGS.

The trial court conducted a bifurcated bench trial, considering (1) whether AMC's film exhibitions were "tangible personal property" and thus "goods" under section 171.1012; and (2) if so, the amount AMC was entitled to receive as a refund. AMC prevailed in phase one, and the Comptroller prevailed in phase two.

---

[1] TAX CODE § 171.1013.

[2] In 2013, the Legislature added $1 million as a fourth option. *See* Act of May 27, 2013, 83d Leg., R.S., ch. 1232, § 6, 2013 Tex. Gen. Laws 3104, 3106.

During phase one, the parties disputed how AMC's "product" should be characterized. To better explain its business, AMC presented evidence that a customer who purchases a ticket from AMC acquires a revocable license to watch a specific presentation at a specific time. Purchasing a ticket does not grant a customer any right to the film itself, and AMC prohibits recording of the presentations.

AMC explained the process by which its staff acquired, assembled, improved, and exhibited films in 2008 and 2009. Its witness testified that AMC licensed first-run motion pictures from distributors like Paramount, Sony, Universal, and Disney, receiving the right to show a film to customers and agreeing to pay the distributors a percentage of AMC's revenue. These distributors delivered films to AMC in four to six small film reels, which AMC spliced together before showtime and returned at the film's box-office conclusion. To the front of the films, AMC added trailers, advertisements, and public service announcements, though the company could not cut, alter, or interrupt the film itself. Finally, AMC offered evidence that it improved each presentation individually by adding tailored "cues" to control auditorium lighting and screen curtains, ultimately creating a "unique audio and visual experience."

AMC does not view its product as complete, however, without carefully designed auditoriums facilitating AMC customers' "premium motion picture . . . experience." AMC's witness testified that AMC's product is the sights and sounds produced in the theater through the screen and speakers that embody the film. To ensure these sights and sounds are of optimum quality, AMC strives to meet visual and acoustical integrity guidelines set by industry groups and technology providers. AMC considers the "projectors, speakers, amplifiers, screens, lighting, surface materials and shapes, and even cubic volume of air" in each auditorium so that each

auditorium functions as an "acoustic chamber": speakers are positioned for optimum sound quality, and seats are arranged to provide every customer a clear line of sight.

When phase one of the trial concluded, the trial court signed findings of fact and conclusions of law. The court concluded that AMC's film exhibitions were tangible personal property and thus "goods for sale in the ordinary course of [AMC's] business under Section 171.1012." Therefore, AMC had properly subtracted its exhibition costs.

As relevant here, section 171.1012 defines "tangible personal property" as (i) personal property that is "perceptible to the senses," and (ii) films and similar creative content embodied in a medium that "is intended or is reasonably likely" to be mass-distributed. TAX CODE § 171.1012(a)(3)(A). In its legal conclusion, the trial court did not mention either of these two prongs of the section 171.1012(a)(3)(A) definition. But the court's sole finding of fact regarding AMC's film exhibitions quoted subsection (a)(3)(A)(i)—the perceptibility prong—word-for-word.[3] The court declined to adopt either party's proposed findings regarding the film prong—subsection (a)(3)(A)(ii).

In phase two of the trial, the court considered how much of AMC's rent, real estate taxes, utilities, and building depreciation could be subtracted as "exhibition costs." AMC sought to subtract costs relating to *all* auditorium square footage. The Comptroller disagreed, arguing only costs associated with auditorium space occupied by speakers and screens qualified. The court ordered the Comptroller to return $258,417 to AMC for 2008 and $289,815 for 2009, plus statutory interest.

---

[3] The finding of fact stated: "When AMC exhibits movies and other content to its paying customers, it produces personal property that can be seen, weighed, felt, or touched or that is perceptible to the senses in any other manner for sale in its ordinary course of business."

Both parties appealed, and the court of appeals affirmed in part and reversed and rendered in part. No. 03-14-00397-CV, 2015 WL 1967877 (Tex. App.—Austin 2015), *withdrawn and superseded on overruling of reh'g*, 580 S.W.3d 663 (Tex. App.—Austin 2017). Regarding whether film exhibition involves the sale of "goods," the court of appeals affirmed, initially holding that AMC sold tangible personal property under the statute's perceptibility prong— subsection (a)(3)(A)(i). 2015 WL 1967877, at *6. The court later issued a substitute opinion on rehearing, however, holding instead that exhibiting films qualified as a sale of goods under the film prong—subsection (a)(3)(A)(ii)—and declining to address perceptibility. 580 S.W.3d at 669– 71. The court of appeals cited subsection (t), which was added by the Legislature in 2013 to address movie theater costs, as persuasive authority favoring AMC's arguments. *Id.* at 671.

Concerning the refund measure, the court of appeals reversed, awarding AMC the entire disputed amount, including costs relating to the auditoriums' total square footage. *Id.* at 675. The Comptroller has not sought review of this portion of the court of appeals' decision.

### ANALYSIS

In a single issue, the Comptroller asks us to reverse the court of appeals' judgment and hold that in 2008 and 2009, section 171.1012 did not permit AMC to subtract its exhibition costs as COGS. He argues that reversal is required for two reasons: (1) costs of film exhibition do not qualify as COGS under section 171.1012 because AMC is not selling tangible personal property when it shows films to customers, and (2) the court of appeals erred by considering the 2013 amendment adding subsection (t).

AMC responds that we should affirm the court of appeals' judgment because (1) its business is the distribution of films' creative content to customers, so its costs of film exhibition

6

qualify as COGS under the film prong and subsection (o); and (2) the court of appeals properly considered the 2013 addition of subsection (t) as a "clarification" of existing law.

We now reverse and hold that AMC was not entitled to subtract its film exhibition costs as COGS because exhibitions are not tangible personal property that is sold. *See* TAX CODE § 171.1012(a)(1).

## I. Standard of review

We review the trial court's conclusions of law de novo, *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996), and its findings of fact for sufficiency of the evidence. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review matters of statutory construction as questions of law with the goal of determining and giving effect to the Legislature's intent. TEX. GOV'T CODE § 312.005; *Colorado County v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). In doing so, we look first and foremost to the plain and common meaning of the statute's words and to the definitions it provides, "unless a different meaning is apparent from the context." *Colorado County*, 510 S.W.3d at 444 (citing *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)). When the words read in context are clear, they determine intent; a court must never rewrite them under the guise of interpretation. *Id.* Only when there is more than one reasonable interpretation of the statutory text, or when its plain meaning leads to absurd or nonsensical results, may we look beyond that language for assistance in determining intent. *Id.*

## II. Applicable law

Section 171.1012 of the Tax Code addresses how to determine a taxable entity's cost of goods sold. A taxable entity electing to compute its taxable margin by subtracting COGS may

7

include "all direct costs of acquiring or producing the goods," including costs of labor, certain materials, handling, storage, depreciation, rent, repairs and maintenance, research and development, and acquisition and production taxes. TAX CODE § 171.1012(c). A taxable entity may also subtract certain indirect costs and up to four percent of its goods-related overhead. *Id.* § 171.1012(d), (f). Certain other costs are expressly excluded from COGS. *Id.* § 171.1012(e).

Eligibility for COGS is not automatic. Rather, as relevant here, a cost may be included in COGS when: (1) the cost relates to "goods," meaning (a) real or tangible personal property that is (b) "sold" in the ordinary course of the taxable entity's business (subsection (a)(1)); and (2) the taxable entity "owns" the goods it is selling (subsection (i)). *Id.* § 171.1012. Although the parties dispute both of these requirements, we need only address the first.

**III. AMC was not entitled to subtract its exhibition costs as COGS because film exhibitions are not tangible personal property that is sold as required by section 171.1012(a)(1).**

Subsection (a)(1) provides that goods must be "sold in the ordinary course of business of a taxable entity" before their related costs may be subtracted as COGS. *Id.* § 171.1012(a)(1). Because the Tax Code does not define "sold," we begin by determining its meaning.

**A. "Sold" as used in subsection (a)(1) means "transferred."**

When a statute contains an undefined term, we typically give the term its ordinary meaning. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016). "If the statute is clear and unambiguous, we must apply its words according to their common meaning." *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). "But we will not give an undefined statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute." *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009). "[I]f a different,

8

more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (per curiam).

The parties disagree regarding which circumstance is present here. The Comptroller argues we should apply the ordinary meaning of the term "sold," which requires some transfer of property or title, or an exchange for value. AMC contends, however, that subsection (o) deems tangible personal property under the statute's film prong sold by its mere *distribution*. It also asserts that subsection (t)—as a later "clarification" of subsection (o)—permits AMC to subtract its exhibition costs as COGS for years 2008 and 2009. Because we conclude that subsections (o) and (t) are inapplicable to this case, we hold that the term sold in subsection (a)(1) assumes its ordinary meaning and thus requires a transfer.

The Comptroller's proposed ordinary meaning of sold is consistent with Texas cases and dictionary definitions. Texas courts have long recognized that a sale requires a transfer: "[t]o constitute a sale of property, the title to, or property in, the thing, must pass from the seller to the buyer." *Cobb v. Tufts*, 2 Willson 141, 141 (Tex. Ct. App. 1888). Indeed, every sale must transfer property, and where no transfer occurs, nothing is sold. *L.H. Woods & Co. v. Half, Weiss & Co.*, 44 Tex. 633, 635 (1876).[4] Similarly, Black's Law Dictionary defines "sale" as "[t]he transfer of property or title for a price." *Sale*, BLACK'S LAW DICTIONARY (11th ed. 2019). A "transfer" is "[a]ny mode of disposing of or parting with an asset or an interest in an asset." *Transfer*, BLACK'S LAW DICTIONARY (11th ed. 2019).

---

[4] The current Texas Business and Commerce Code, governing many of the same entities subject to the franchise tax, similarly provides that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." TEX. BUS. & COM. CODE § 2.106(a).

Contrary to AMC's assertions, subsection (o) does not override the "sold" requirement because AMC has not shown that (o) applies here. Subsection (o) applies only to taxable entities "whose principal business activity is film . . . production or . . . the distribution of tangible personal property described by [the film prong], or any combination of these activities." TAX CODE § 171.1012(o).[5] AMC claims that its "production and exhibition process" meets the requirements of subsection (o) because its "principal business is the production and distribution of a film's creative content." The Comptroller disagrees. In his view, AMC cannot rely on subsection (o) because AMC's principal business—as understood in the film industry—is *exhibition*, an activity not within (o)'s scope.

In the trial court, the parties extensively addressed whether AMC's principal business activity is production, distribution, neither, or a combination of both. *See id.* Distribution is not defined in the Tax Code, while production is defined very generally as "construction, manufacture, development, mining, extraction, improvement, creation, raising, or growth." *Id.* § 171.1012(a)(2). AMC favored applying this definition of production and argued distribution should be given its ordinary meaning: "to deliver." AMC produces film property, it argued, by improving and assembling film reels, and it distributes film property by delivering it to customers

---

[5] Subsection (o) provides:

If a taxable entity . . . whose principal business activity is film or television production or broadcasting or the distribution of tangible personal property described by Subsection (a)(3)(A)(ii), or any combination of these activities, elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described in this section in relation to the property and include depreciation, amortization, and other expenses directly related to the acquisition, production, or use of the property, including expenses for the right to broadcast or use the property.

TAX CODE § 171.1012(o).

via its speakers and screens. The Comptroller urged the court to interpret both terms within subsection (o) more precisely, in accordance with their meanings in the film industry.

At trial, the Comptroller's expert provided testimony on the meanings of production and distribution in the film industry. Regarding production, he testified: "Film production is creating the movie. It's akin to manufacturing the movie" and generally involves engaging actors, drafting scripts or outlines, securing financing and locations, and contracting with various suppliers. Regarding distribution, he explained: "In the film business distribution has a particular meaning," involving handling delivery of the films, financing the production of the films, and "tak[ing] care of all the press and the publicity" for the films.

Distributors include entities like Disney, Lionsgate, and Columbia Pictures, while theaters like AMC are called "exhibitors." Exhibitors manage theater venues, "provid[ing] a communal experience and a service allowing people who want to see a movie in a theater" to do so "by projecting [the film] on the screen." Given this testimony, the Comptroller argued, subsection (o) excludes AMC because its principal business activity is not production or distribution as those terms are understood in the film industry. The term exhibitor more aptly applies.

Although the trial court heard substantial testimony and argument regarding subsection (o)'s application to this case, its findings of fact and conclusions of law made no mention of that subsection or of a principal business activity of production or distribution.[6] Nor did the court of

---

[6] We take this opportunity to emphasize how important thorough findings of fact and conclusions of law are to reaching a correct decision in a bench trial and facilitating efficient appellate review, particularly in a technical statutory area of law such as taxation. In a jury trial, the charge reveals the court's resolution of many legal questions regarding the applicable standards and definitions, and it identifies the factual disputes to be settled by the jury. No such document exists following a bench trial unless the trial court signs factual findings and legal conclusions covering the salient issues. In this case, issues unaddressed by the trial court's brief findings and conclusions include what disputed statutory terms mean, which specific parts of the statute apply and why, and what (if any) factual disputes were resolved in deciding that they apply. Indeed, the court adopted neither side's proposed findings or conclusions

appeals address the matter. AMC's scant briefing on subsection (o) does not acknowledge this lack of a decision by the courts below or ask us to affirm on this alternative ground. *Cf.* TEX. R. APP. P. 53.4; *Padilla v. LaFrance*, 907 S.W.2d 454, 464 n.6 (Tex. 1995).

Even construing AMC's brief liberally as including such a request, we conclude AMC cannot rely on subsection (o) because "more precise definition[s]" of production and distribution that do not cover AMC's principal business activities are "apparent from the term[s'] use in the context of the statute." *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). The statutory text shows the Legislature intended subsection (o) to cover the media industry. *See* TAX CODE § 171.1012(o) (referring to film, television, broadcasting, and tangible personal property under the "film" prong). The prominent roles "production" and "distribution" play in this media-centric provision—and their use in conjunction with "broadcasting"—support the adoption of precise meanings for those terms. *Greater Hous. P'ship*, 468 S.W.3d at 59 ("The statute's first contextual clue emerges from the words immediately surrounding [the word in question]."); *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011) ("[S]imilar terms [must] be interpreted in a similar manner.").

Subsection (a)(2)'s general definition of production is not to the contrary. Production is used frequently throughout section 171.1012 to describe costs of various production activities; however, subsection (o) uses the term to describe entities' activities in the media business. *Compare* TAX CODE § 171.1012(c)(3) (including "cost of materials that are consumed in the

---

on many issues, thereby complicating the appellate process for all parties (who would, for example, need to raise cross-issues on unaddressed alternative grounds and show they proved as a matter of law any refused factual findings necessary to their case). Given this lack of clarity, it is perhaps not surprising that the court of appeals issued two different opinions attempting to decide which (if any) prong of the definition of tangible personal property applied, and this Court is resolving the case on a foundational issue that neither court below separately addressed.

ordinary course of performing *production activities*") (emphasis added), *with id.* § 171.1012(o) ("a taxable entity . . . whose principal business activity is film or television production"). This difference in context indicates that production as used in (o) has a more precise meaning than (a)(2)'s definition.[7]

Finally, subsection (o)'s surrounding provisions also support a more precise interpretation, as many are tailored to cover particular institutions or activities. *See id.* §§ 171.1012(k) (lending institutions), .1012(k-1) (heavy construction equipment rental or leasing companies), .1012(k-2) (pipeline entities).

Applying the more precise meanings of production and distribution within subsection (o) to the undisputed evidence regarding the nature of AMC's business (summarized above),[8] we hold as a matter of law that AMC's principal business activity is not production or distribution as understood in the film industry. Thus, subsection (o) does not apply.

Subsection (t)—adopted five years after the tax years in question and not applicable retroactively—likewise does not affect our interpretation of sold. That subsection expressly allows movie theaters to subtract exhibition costs as COGS:

> If a taxable entity that is a movie theater elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described by this section in relation to the acquisition, production, exhibition, or use of a film or motion picture, including expenses for the right to use the film or motion picture.

---

[7] *See In re Office of the Attorney General of Texas*, 456 S.W.3d 153, 155–56 (Tex. 2015) (per curiam) ("The meaning of words read in isolation is frequently contrary to the meaning of words read contextually in light of what surrounds them . . . . The import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive.").

[8] Although the parties dispute whether AMC's business meets the legal definitions of production or distribution, they do not dispute factually what its business entails.

*Id.* § 171.1012(t). The court of appeals concluded that disallowing subtraction of AMC's exhibition costs here would be "at odds with" this provision, 580 S.W.3d at 671, which the amending act characterized as "a clarification of existing law." Act of May 27, 2013, 83d Leg., R.S., ch. 1232, § 10(b), 2013 Tex. Gen. Laws 3104, 3108.

The Comptroller argues the court of appeals erred in treating subsection (t) as controlling because it allowed a later Legislature to construe an earlier Legislature's enactment. AMC disagrees, asserting that courts interpreting statutes should consider amendments, especially clarifying ones that do not change prior law. According to AMC, the court of appeals properly considered subsection (t) as a clarification of subsection (o)'s existing scope.

Our starting point in resolving this dispute must be the language of the original and amended statutes. Even if the Legislature amends a statute "to clarify what it believe[s] to be existing law, we cannot attribute the intent of [the amending] Legislature to that of [an earlier] Legislature, which initially promulgated [the statute]." *In re C.O.S.*, 988 S.W.2d 760, 764 (Tex. 1999). Rather, "[w]e are constrained to construe the statute as it existed" in the tax years at issue. *Id.*

Section 171.1012 begins by stating general rules for determining cost of goods sold. In later subsections, such as (o) and (t), the Legislature alters those rules in certain respects. Some subsections modify the types of costs an entity may subtract as COGS, while others modify the types of entities entitled to subtract those costs. In *Sunstate Equipment Co., LLC v. Hegar*, also issued today, we explain that subsection (k-1) modifies only the entities entitled to the COGS subtraction while leaving the subtractable costs unchanged. __ S.W.3d __, __ (Tex. 2020).

14

Applying this understanding of the statutory scheme, we conclude subsection (t) arguably clarifies the law on subtractable costs, but it also changes the law on which entities may make those subtractions—the very point critical to AMC's case. Specifically, although subsection (t) adds exhibition costs to subsection (o)'s list of subtractable costs, these costs were arguably already included as costs of acquisition and use under subsection (o).[9] In this sense, we agree that (t) is a clarification of (o)'s permitted costs.

But subsection (t) also goes a step further by changing the types of entities entitled to this subtraction. Subsection (t) allows a "movie theater" to subtract exhibition costs without satisfying subsection (o)'s requirement that its "principal business activity" be film production or distribution. *Compare* TAX CODE § 171.1012(t), *with id.* § 171.1012(o). Because this change was not retroactive, AMC cannot rely on subsection (t) to subtract its costs of acquisition, exhibition, or use for the tax years in question.[10]

### B. AMC's film exhibitions do not transfer tangible personal property as required by subsection (a)(1).

Having concluded that a "sale" under section 171.1012(a)(1) must be a transfer, we next consider whether AMC transfers tangible personal property when it exhibits films, such that it may subtract its costs related to the property. Both aspects of this requirement—a transfer and tangible personal property—must be satisfied. *See id.* § 171.1012(a)(1) (defining goods as "real or tangible personal property sold in the ordinary course of business"). A taxable entity's offerings may include tangible personal property that is not transferred as well as intangible property that is

---

[9] Whether a specific cost is considered a cost of exhibition as well as a cost of acquisition or use will depend on the facts of each case, and we express no view on when or how frequently those categories will overlap—an issue not addressed by the parties.

[10] Nothing in our opinion precludes AMC from subtracting its exhibition costs in tax years following subsection (t)'s enactment.

15

transferred—neither of which would satisfy the statute. *Id.*; *see also id.* § 171.1012(a)(3)(B) (defining tangible personal property to exclude intangible property and services).

Here, it is undisputed that AMC transfers to its patrons the right to see a film, but the Comptroller argues—and AMC agrees—that this revocable license to watch a film is intangible. *See First Nat'l Bank of Fort Worth v. Bullock*, 584 S.W.2d 548, 551 (Tex. App.—Austin 1979, writ ref'd n.r.e.) (holding that sale of license was sale of intangible property).[11] Of course, the films themselves are expressly defined as tangible personal property, but the Comptroller contends AMC's film exhibitions are a service and do not transfer or mass-distribute any "medium" embodying the film's creative content, as the film prong requires. *See* TAX CODE § 171.1012(a)(3)(A)(ii). AMC responds that when the film prong is read in context, it deems the film's creative content itself to be tangible personal property "without regard to . . . the medium in which the [creative content] is embodied." *Id.*

We reject AMC's construction of the film prong and hold that property with a physical or demonstrable—that is, tangible—presence must be transferred. Transferring a film's creative content alone will not suffice.[12]

Although the film prong's definition of tangible personal property does not contemplate a particular medium, it does require that the "medium in which the property is embodied" is intended or is reasonably likely to be mass-distributed. *Id.* According to AMC, the medium embodying

---

[11] We recognize that certain licenses may meet the statutory definition of "tangible personal property." But here, AMC has conceded that "a bare license is intangible property." We agree with AMC's assertion that "the sale of [tangible personal property] and the sale of an accompanying license can happen simultaneously," but we conclude no sale of tangible personal property occurred here for the reasons explained.

[12] Given this holding, we need not decide whether film exhibition is a service.

exhibited films is its auditoriums' speakers and screens. But AMC's speakers and screens are not mass-distributed, nor are they even transferred.[13]

The court of appeals relied on the perceptibility prong in its original opinion upholding AMC's subtractions, but we conclude it likewise requires a transfer of property with some physical or demonstrable presence, which did not occur here. The perceptibility prong covers "*personal property . . . that is perceptible to the senses.*" *Id.* § 171.1012(a)(3)(A)(i) (emphasis added). Though "personal property" is not defined in the Tax Code, it generally means "everything that is subject to ownership" that is not real property, *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 640 (Tex. 2000), most commonly interests in goods and money, *see, e.g.*, TEX. EST. CODE § 22.028, TEX. PROP. CODE § 42.002(a). When AMC's customers see a presentation, the only personal property they leave with (excluding concessions) is a movie ticket. The "sights and sounds" embodied in AMC's theaters are certainly perceptible to the senses, but they are not "subject to ownership" and thus cannot be personal property. *Lang*, 35 S.W.3d at 640.

## CONCLUSION

Because no tangible personal property is transferred through AMC's film exhibitions, we hold that the exhibitions are not goods under section 171.1012(a)(1). Therefore, AMC was not entitled to subtract its costs related to the exhibitions as COGS for tax years 2008 and 2009. We

---

[13] By concluding that the film prong requires the medium embodying a film's creative content to be distributed, we necessarily disagree with AMC's contention that distribution of the content alone satisfies subsection (a)(3)(A)(ii). AMC offers several examples in which it claims creative content is decoupled from the medium traditionally embodying it when that content is sold: words and pictures are decoupled from printed books when downloaded as e-books, and films are decoupled from DVDs when streamed digitally. Although we do not pass on whether these digital forms of media constitute tangible personal property that is sold, we note that some medium is transferred to the consumer in each of these scenarios—be it paper and ink, a disc, or data sent to a user's device. No such medium is transferred in a film exhibition.

17

reverse the court of appeals' judgment and render judgment that AMC take nothing by its suit concerning tax years 2008 and 2009.

_____

J. Brett Busby
Justice

**OPINION DELIVERED:** April 3, 2020